UNITED STATES v. DETROIT TIMBER & LUMBER CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 28, 1904.)

No. 2,009.

1. GOVERNMENT LANDS—TITLE OF BONA FIDE PURCHASER AFTER PATENT UN-ASSAILABLE IN EQUITY.

The title of a bona fide purchaser of lands subsequent to the issue of the patents is superior to the equitable claim of the United States to avoid the patents and the title under them for fraud or error in the issue of the former.

2. SAME—PURCHASERS UNDER RECEIVER'S FINAL RECEIPTS.

Purchasers in good faith, without notice, for value, of the equitable title evidenced by receivers' final receipts upon which patents subsequently issue, have a complete defense of a bona fide purchase unassailable by a suit of the United States to avoid the patents and the titles under them for fraud, perjury, or error in the procurement of the former.

3. SAME—RECEIVER'S FINAL RECEIPTS—NOTICE TO PURCHASERS.

Receivers' final receipts are notice to purchasers of the equitable title they evidence, that they are voidable by the Land Department for fraud or error at any time before the patents issue upon them, but they are not notice that the equitable titles they disclose were procured by fraud, perjury, or irregularity. On the other hand, they are prima facie evidence that the lands they describe were honestly and regularly entered, and that the entrymen who obtained them are entitled to the patents for the land.

4. EQUITY—RIGHTS OF GOVERNMENT AND OF INDIVIDUALS.

The equities of the United States appeal to a court of chancery with the same, but with no greater or less, force than those of an individual in like circumstances.

5. BONA FIDE PURCHASER OF EQUITABLE ESTATE—SUBSEQUENTLY ACQUIRED LEGAL ESTATE.

Where equities are equal, the law prevails. A court of equity will not interfere at the suit of a holder of a prior equitable title or claim to deprive an innocent purchaser for value of a junior equitable estate of a legal estate or advantage which he has subsequently bought or obtained after notice.

6. BONA FIDE PURCHASER—DUTY OF INQUIRY.

Where a vendor presents conveyances to himself prima facie valid, and assures the purchaser that his title under them is perfect, no duty to in-

---

¶ 1. See Public Lands, vol. 41, Cent. Dig. § 368.

vestigate farther is imposed upon the buyer in the absence of other facts and circumstances suggesting investigation.

7. SAME—ORDER OF ACQUISITION OF ELEMENTS IMMATERIAL.

The concurrence of the essential elements of good faith, absence of notice, payment of value, and legal estate in the purchaser at one time constitutes a complete defense of a bona fide purchase. The order in which these elements were acquired is not material.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Western District of Arkansas.

For opinion below, see 124 Fed. 393.

This is a suit to avoid 44 patents issued under the stone and timber act of June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901. p. 1545], and all conveyances of the patented lands or of the timber upon them. The patentees and their immediate and remote grantees are defendants and appellees. The suit was commenced on April 5, 1902. The United States alleged in its amended bill that each of the patentees agreed before entering the land that the entry should be made for the Martin-Alexander Lumber Company, a corporation of Arkansas; that, if no such agreement was made, each patentee made his or her entry on speculation; that immediately after the lands were entered each of the entrymen and each of the entrywomen, with the exception of three, conveyed the timber growing on his or her land to the Martin Company; that patents were issued to all these lands between February 23, 1900, and May 9, 1901, and that on January 14, 1901, the Martin Company sold and assigned all the contracts for the timber on the lands to the Detroit Timber & Lumber Company, a corporation of Michigan, which had knowledge of the character of the entries and of the frauds which had been perpetrated in making them. The Detroit Company answered that the lands were regularly and lawfully entered and patented; that 41 of the patentees sold the timber on their lands to the Martin Company shortly after they entered them; and that on January 14, 1901, it purchased the timber contracts and all the other property of the Martin Company. It denied that the lands were entered on speculation, and that any agreement had been made that any of them should be entered for the benefit of the Martin Company. It denied that it had any notice or knowledge that any of the lands had been fraudulently entered before it purchased and paid for the timber contracts, or before the lands were patented; and averred that it bought and paid value for them in good faith, without notice of any fraud or defect in the title to them. The answer of the Martin-Alexander Company presents the same issues as that of the Detroit Company. The answers of the other defendants, if there were such, do not appear in the record, because the land without the timber is of no value. The salient facts disclosed by the evidence at the final hearing were these: The Martin-Alexander Lumber Company had a sawmill in the vicinity of the lands which are the subject of this controversy, and it was desirous of obtaining timber to manufacture into lumber. E. B. Martin owned 58½ per cent. of the stock of this corporation, and, with the exception of one share, A. V. Alexander controlled all of the remainder, which was owned by himself, his wife, and J. O. Means. Copeland was an employé of the company, and an intelligent and influential man. He obtained a copy of the act of June 3, 1878, consulted with one of the officers of the local land office relative to its proper construction, and told Alexander and Martin that he knew honest men who he thought would enter land of the government under this act if they could borrow the money to pay for it. Martin replied that he would loan such men money for that purpose. The stumpage value of the timber was 50 cents per thousand feet, and the Martin Company was offering and paying that price. At this price the average value of the timber on each 160 acres of this land was about $40 in excess of the government's price for the lands, which was $2.50 per acre, so that an entry was likely to entail no loss, and might yield the entryman some profit. Copeland informed some of his acquaintances of this situation and of the law, and asked them if they would like to enter some of the land. Others applied to him for this information, and he imparted it. The men and women thus informed made

the entries upon which the patents in suit are based. They were poor, and unable to pay for the land without borrowing money. Copeland assisted them to select the land and to make their entries. They made two journeys to the local land office, one to make their applications and one to pay for the land and obtain their final receipts. The Martin Company paid their traveling expenses upon these trips and the fees for the publication of the notices required by the statute. Twenty-five of the 44 patentees were employés of the Martin Company and 10 were wives of employés. When the time came to pay for the lands, the company loaned to each one of the patentees the amount required for that purpose, and he or his companion or agent paid for the land, and obtained the final receipt. Within a few days after the final receipt was obtained he made a promissory note for the amount he had paid for the land and interest at 8 per cent. per annum. He then made a written agreement with the Martin Company that in consideration of $1 and of the covenants recited therein he "has bargained, sold, and conveyed" unto the company all the timber and trees upon the land, and the right to enter and take them; that the company will pay him 50 cents per thousand feet scale measure for the lumber in the trees; that it has paid him the amount which he had borrowed and paid for the land, and that it will pay him the balance beyond that amount and 8 per cent. interest in monthly payments as the timber is cut and removed from the land. Upon the execution of this contract the note was canceled and surrendered. The transaction with all the entrymen but two and with all the entrywomen but one took the form which has been described. Two of the entrymen and one of the entrywomen refused to give notes or make timber contracts, although they borrowed the money and used it to pay for their lands. These three defendants entered their land July 5, 1900, and in April, 1901, they sold and conveyed it to the Detroit Company, through an agent of the latter, for the amount of their debts for the borrowed money and $75 each. The 44 entries were made at various times between August 21, 1899, and September 6, 1900, and the timber contracts were made immediately after the respective entries were completed. Patents were issued for all these lands prior to May 9, 1901. Thirteen of these patents were issued before January 14, 1901, and 40 before May 1, 1901. On January 14, 1901, the Detroit Timber & Lumber Company purchased all the property of the Martin Company for $60 000 and the assumption of its debts. The office and place of business of the Martin Company was in Pike City, Ark.; that of the Detroit Company in St. Louis, Mo., and U. L. Clark was its president. About December 20, 1900, Alexander went to St. Louis, and applied to Clark to purchase the property of the Martin Company for the Detroit Company. He requested Clark to purchase Martin's interest and to let him retain his interest. Clark declined, and told him that the Detroit Company would not purchase unless it could buy the entire property. Alexander then asked to be permitted to take stock in the Detroit Company for his interest. Clark replied that the latter company had no stock to sell; that he could not promise any; and that the purchase must be of the entire property of the Martin Company for cash; but that the Detroit Company might increase its stock, and, if it did so, it was possible that Alexander might obtain some. Alexander thereupon agreed that the entire property should be sold, and that he would sell his interest for cash at the same rate the Detroit Company should purchase Martin's interest, if the latter company did not increase its stock and pay him in that. Thereupon Clark sent the Detroit Company's inspector to Arkansas, and he examined the lands, and reported the amount of timber on them. Clark then went to Arkansas, and agreed with Martin to pay him $35.000 for his interest and that of J. O. Means on the basis of $60,-000 for the entire property. Thereupon, on January 14, 1901, the board of directors of the Martin Company resolved that it sold all its property to the Detroit Company for $60.000 cash and the assumption of its liabilities; that the $60,000 should be divided among its stockholders in this way: to E. B. Martin, $34,850, to Mrs. B. M. Alexander, $24,850, to A. V. Alexander, $150, to J. O. Means, $150; that the sums due Martin and Means were then paid in cash by the Detroit Company, that the payment of the sums due the Alexanders was deferred until their application for stock of the Detroit Company was determined, and that, to relieve Martin, who resided in Chicago, from further attendance, his stock was transferred to Clark and to the Detroit Company, and

that Clark was elected temporary president of the Martin Company in the place of Martin, who resigned. The 41 timber contracts and deeds of other lands were then turned over to the Detroit Company. The Martin Company owed Martin $17,456.79, so that he was entitled to receive about $52,000 as his share of the proceeds of the sale. Clark gave him on that day in the form of a check of the Detroit Company $27,456.79, and he went to St. Louis with him immediately, and caused the Detroit Company to assign to him a promissory note of the Bodcan Lumber Company for $25,000, which it owned. As soon as practicable after this sale the affairs of the Martin Company were wound up. Clark disliked the trouble of keeping an account of the timber cut on the lands covered by the timber contracts, and between April 1, 1901, and September 10, 1901, he caused the Detroit Company to procure conveyances to it of the title to the lands held by 24 of the patentees who had made timber contracts, and from the 3 who had not made such contracts, so that by September 10, 1901, it held the legal title to the lands of 27 of the 44 patentees. The Detroit Company paid from $6.25 to $75 for each of these deeds, but it paid $25 for each of 18 of them. In fulfillment of the sale of January 14, 1901, the Detroit Company increased its stock, and on April 22, 1901, issued stock of the par value of $25,000 to the Alexanders in place of the cash due them from the sale. A formal deed of all its property by the Martin Company to the Detroit Company, dated March 1, 1901, and acknowledged May 2, 1901, was made and delivered on the latter date to the Detroit Company. Clark was not acquainted in Arkansas when he made this purchase. The deeds of the lands and the timber contracts were turned over to him. The timber on the lands covered by the timber contracts cost the Martin Company about $18,000, and this timber was but a part of the property for which the Detroit Company paid $60,000. Martin and Alexander told Clark when he made the purchase that all the people under whom the Martin Company held land or timber had patents or final receipts for their lands, and that the company's title to the timber was perfect. He believed their statements, had no suspicion that they were not true, and made no farther investigation of the titles. He always calculated that the title was all right if the party had a final receipt. Neither Clark nor any of the officers of the Detroit Company ever had any knowledge or suspicion that there was any fraud in the procurement or any defect in the title of any of the 44 patentees or in the title the company purchased until the last of September or the first of October, 1901, more than four months after it had paid all this consideration and had received its deed for the property, and more than four months after the United States had issued its patents to all the lands. Upon this state of facts the Circuit Court found that no one of the patentees entered his or her land on speculation, or made any agreement whereby the title to it should inure to any one except himself or herself, and dismissed the bill. The government challenges the decree of dismissal by this appeal.

F. A. Youmans and Fred A. Maynard (James K. Barnes, on the brief), for appellant.

W. E. Hemingway and James F. Read (Thomas C. McRea, J. B. McDonough, U. M. Rose, George B. Rose, and J. C. Pinnix, on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This is a suit in equity to enforce a forfeiture of the purchase price which the United States has received for certain of its lands, and to avoid the patents which constituted the consideration for the payment of this price. The act of June 3, 1878, c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545], provides that upon certain conditions a citizen of the United States may purchase not exceeding

160 acres of certain lands of the United States, which are valuable chiefly for timber and are unfit for cultivation. One of the conditions of this purchase is that the applicant shall file with the register of the proper district a written statement under oath that he does not apply to purchase the land he seeks to buy on speculation, and that he has not made any agreement with any person or persons by which the title that he might acquire from the government would inure to the benefit of any person except himself. The act provides that, if any person who makes oath to this statement shall swear falsely in the premises, he shall forfeit the money he may have paid for the lands, and all right and title to them, and that any grant or conveyance he may have made, except in the hands of bona fide purchasers, shall be void. Forty-four of the defendants in this suit took this oath and entered, and paid the government price for 44 tracts of land at various times between August 21, 1899, and September 6, 1900. Forty-one of them conveyed the timber on their land to the Martin-Alexander Company immediately after they made their respective entries and obtained their respective final receipts. On January 14, 1901, the defendant the Detroit Lumber Company bought this timber of the Martin Company, and the consideration for that purchase was paid by it and the timber was conveyed to it before May 3, 1901. Patents were issued for all the lands before May 9, 1901. In the month of April, 1901, the Detroit Company purchased the lands of the three patentees who had declined to execute timber contracts, and the legal title to that land and to the timber upon it was thus vested in that company. Between April 1, 1901, and September 10, 1901, the company purchased the legal title to the lands entered by 24 of the patentees who had made timber contracts, and this title was duly conveyed to it. In the last days of September or the first days of October, 1901, the company for the first time learned that the United States was suggesting that these lands had been illegally entered, and on April 5, 1902, the government commenced this suit. The lands without the timber upon them are worthless, and the real controversy here is between the United States and the Detroit Company.

The suit presents two issues: (1) Whether or not the patentees applied to purchase the lands on speculation, or had made agreements before they filed their applications by which the titles they hoped to acquire would inure to the benefit of any person except themselves; and, if so, (2) whether or not the Detroit Company had knowledge or notice of that fact, so that the complainant is entitled in equity to an avoidance of the title to the timber which that company has acquired. The case of the government did not appeal with compelling force to the conscience of the chancellor below. He found the first issue in favor of the defendants, and dismissed the bill. This finding is vigorously assailed. If, however, the Detroit Company was a bona fide purchaser of the timber without notice of the alleged fraud and perjury of the patentees, it is not material to the issue between the government and that company whether or not the patentees were guilty of these crimes. The act of June 3, 1878, expressly exempts from avoidance

conveyances in the hands of bona fide purchasers. The evidence which conditions the issue of the fraud of the patentees is voluminous and contradictory, and for the purpose of the consideration of the other issue, which, if determined in favor of the Detroit Company, must practically dispose of this case, it is conceded that each of the patentees applied to enter the tract which he or she secured on speculation, or that he or she, before making the application, had made a contract whereby the title to the lands would inure to the benefit of the Martin-Alexander Lumber Company. The question then becomes, had the Detroit Company any notice or knowledge, actual or constructive, of this conceded fact, before it completed its purchase of the timber? It bought the timber contracts, together with all the property of the Martin Company, on January 14, 1901. It made its first payment of $27,-456.29 in cash on that day, its second payment of $25,000 a day or two later, and its final payment of $25,000 of stock on April 22, 1901. The timber contracts, the deeds for the lands bought, and the possession and control of the property of the Martin Company were delivered to the Detroit Company on January 14, 1901, and the formal bill of sale and deed upon May 2, 1901. It is not material at what date prior to the 2d day of May, 1901, this sale is deemed effective, because the notice to the Detroit Company or the lack of it remained the same during all this time. On January 14, 1901, when the sale was initiated, receiver's final receipts had been issued to all of the 44 patentees, and patents had been delivered to 13 of them. On May 2, 1901, when the sale was completed, patents had been issued to 40 of them. The Detroit Company was dealing with the Martin Company at arm's length. It was the vendee; the Martin Company was the vendor. The latter exhibited its contracts and deeds, and declared that the titles under them were perfect, and that every grantor under whom it held had a patent or a final receipt for his land. Clark, the president of the Detroit Company, who conducted the negotiation and made the purchase, examined and checked the contracts and deeds, believed the statements of the officers of the vendor, and completed the purchase. The evidence is clear, positive, and without dispute that neither the Detroit Company nor its officers ever had any knowledge or suspicion that any of the lands here in controversy were irregularly or fraudulently entered until the latter part of September, 1901, more than four months after the purchase had been completed and after all the patents had issued.

But counsel for the government maintain that, although the purchaser had no actual notice, it had legal or constructive notice of the fraud in the entries of the lands, (1) because there was no actual sale of property by the Martin Company to the Detroit Company, but a mere merger of the two corporations into one; (2) because notice sufficient to put a person of ordinary prudence on inquiry is notice of all that a reasonably diligent investigation would disclose, and the Detroit Company had such notice; (3) because the timber contracts were not conveyances, but mere executory agreements to convey; and (4) because a legal estate is indispensable to the defense of a bona fide purchase, and the final receipts, which had not ripened into patents when the Detroit Company made its purchase, evidenced equitable titles only,

131 F.—43

and constituted notice that their issue was induced by fraud and perjury. Let us consider these arguments in their order.

The complainant alleged in its bill, the defendant admitted in its answer, and the evidence demonstrated that the Martin Company sold, assigned, and transferred the timber contracts to the Detroit Company on January 14, 1901. No merger of the two corporations was pleaded; none was proved. The transfer of the stock of Martin in his company to Clark and to the Detroit Company and the substitution of Clark for Martin as president of the former company when the sale was made was nothing but a means to an end, a device to effect the sale and to transfer the immediate possession and control of the property to the vendee. That transfer was not intended to merge, and it did not merge, the two corporations into one, nor did it charge Clark or the Detroit Company with notice of any of the acts or transactions of the Martin Company of which he was not otherwise aware. In his relations to the Martin Company and to its grantors, the United States and the entrymen and entrywomen, Clark was still the agent and representative of the purchaser, and not of the seller. There is no evidence in this record that notice of facts sufficient to put a person of ordinary prudence on inquiry for fraud and perjury in the applications for the purchase of these lands was ever given to the Detroit Company, or to any of its officers, before it consummated its purchase; nor is there any evidence that a reasonably diligent inquiry would have discovered fraud or perjury if it had been instituted. Clark saw the timber contracts, and received the assurance of the vendor that all the grantors in them had patents or final receipts for their lands, and that the title under them was perfect. These were all the facts relative to this matter of which Clark received notice. The contracts were such as any entryman might lawfully make under the opinion of the Supreme Court in U. S. v. Budd, 144 U. S. 154, 163, 12 Sup. Ct. 575, 36 L. Ed. 384. They were not of the same date, but were executed at various times between July, 1899, and September 6, 1900. There was nothing here to incite a reasonably prudent man to inquire for fraud in the entries of the land. Nor would a reasonably diligent inquiry have discovered any fraud. If the question had been put to the entrymen, to the entrywomen, to Martin, and to Alexander, they would have answered with a single voice that the statements in the applications were true, for they have so testified here. If inquiry had been made of the officers of the land department, they would have replied that there was no falsehood in the statements and that the entries were lawfully and regularly made, for they issued the final receipts and the patents upon them in that belief.

Nor was there any duty upon this purchaser, in the absence of other facts suggesting inquiry, when the seller presented conveyances to it apparently valid, and gave its assurance that they vested perfect titles in it, to make further investigation. The presumption always is, in the absence of countervailing evidence, that men tell the truth and that bills of sale and deeds prima facie valid are actually so, and purchasers may lawfully act upon this presumption. Jones v. Simpson, 116 U. S. 609, 615, 6 Sup. Ct. 538, 29 L. Ed. 742. "Where a person has not

actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as enable the court to say not only that he might have acquired, but also that he ought to have acquired, the notice with which it is sought to affect him; that he would have acquired it but for his gross negligence in the conduct of the business in question." Ware v. Lord Egmont, 4 D. M. & G. 460, 473; Sugden on Vendors, 622; Wilson v. Wall, 73 U. S. 83, 91, 18 L. Ed. 727. "What makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell." Meehan v. Williams, 48 Pa. 238, 241; Townsend v. Little, 109 U. S. 504, 511, 3 Sup. Ct. 357, 27 L. Ed. 1012; Colorado Coal Co. v. U. S., 123 U. S. 307, 316, 319, 8 Sup. Ct. 131, 31 L. Ed. 182; Crawford v. Neal, 144 U. S. 585, 595, 12 Sup. Ct. 759, 36 L. Ed. 552. The notice to the Detroit Company meets none of these tests of constructive notice where actual notice is absent.

The next contention is that the timber contracts conveyed nothing but an equitable claim to the title of the grantors in them to the timber, because they were executory contracts to sell, and that, therefore, the Detroit Company could not be a bona fide purchaser, because it acquired no legal estate under them. But the contracts were not executory agreements to sell, but absolute conveyances in præsenti of the timber growing upon the land. They therefore vested in the Martin Company and its grantors an interest in the real estate. White v. Foster, 102 Mass. 375; Russell v. Myers, 32 Mich. 522.

Finally, counsel for the government say—and this seems to be the argument upon which they most implicitly rely—that acquisition of the legal title was indispensable to the defense of a bona fide purchase; that the legal title to all but 13 of the 44 tracts was in the United States when the Detroit Company purchased; that the title to the timber on these 31 tracts which the Detroit Company bought was a mere equitable title evidenced by the final receipts; that these receipts constituted notice to the Detroit Company that they had been secured by the fraud and perjury of the entrymen and entrywomen, and that the company could not divest itself of this notice by the subsequent issue of the patents and the acquisition of the legal title which inured to it thereunder. There are many reasons why this argument is not persuasive. In the first place, conceding for the present, without admitting or deciding this to be the law, that a legal estate in the vendee is an essential condition of the defense of a bona fide purchase, such an estate vested in the Detroit Company before it received any notice of the alleged fraud. In the second place, the patents, when issued, related back to the dates of the applications upon which they were founded, and vested the legal estate in the timber in the Detroit Company as of the date of its purchase from the Martin Company, and before it had notice of the fraud. And, in the third place, the Detroit Company was an innocent purchaser for value, in good faith, of the equitable title to the timber, evidenced by the final receipts, and the legal title vested in it by the issuance of the patents before the government assailed either.

Counsel for the government cite in support of their position that one who innocently purchases the equitable title evidenced by receiv-

ers' final receipts, and subsequently acquires the legal estate evidenced by patents issued upon them, is charged with notice of fraud and perjury in the inception of his title from the government, and cannot be a bona fide purchaser. U. S. v. Steenerson, 50 Fed. 504, 1 C. C. A. 552; American Mortgage Co. v. Hopper (C. C.) 56 Fed. 67; Id., 64 Fed. 553, 559, 12 C. C. A. 293, 299; Diller v. Hawley, 81 Fed. 651, 655, 26 C. C. A. 514, 518; Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157; U. S. v. Bailey, 17 Land Dec. 468; Orchard v. Alexander, 157 U. S. 372, 15 Sup. Ct. 635, 39 L. Ed. 737; Parsons v. Venzke, 164 U. S. 89, 91, 17 Sup. Ct. 27, 41 L. Ed. 360; Guaranty Savings Bank v. Bladow, 176 U. S. 448, 453, 20 Sup. Ct. 425, 44 L. Ed. 540; California Redwood Co. v. Litle (C. C.) 79 Fed. 854; Id., 87 Fed. 1004, 31 C. C. A. 591. But these authorities fail to sustain the proposition. They are cases in which the final receipts which evidenced equitable titles were avoided by the officers of the Land Department before the legal estate had been vested in the innocent purchasers. In these cases the courts held that the receiver's final receipt is prima facie evidence of the right of the entrymen to a patent; that the power is vested in the Land Department to set this aside and to cancel the entry it evidences for fraud or error after proper notice to the parties in interest, and in this way to take away from the innocent purchaser his prima facie evidence of title; that this power is not arbitrary or unlimited, but its exercise is always subject to judicial inquiry; that it is limited in duration to the time anterior to the issue of the patent; and that the avoidance of the receipt and the cancellation of the entry do not strike down the right of the purchaser to enforce the equitable title which he has purchased in the courts of the land, but that its effect is to compel him to sustain that title by evidence de hors the receipt. But the case in hand is not ruled by these conclusions. The Land Department did not avoid, it confirmed, the voidable title which the Detroit Company purchased by adding to it the legal title. The receiver's final receipts were not notice of fraud and perjury in their procurement. They were notice of honesty and legality in the proceedings that induced their issue. They were prima facie evidence that those who received them had the right to patents to the lands, and they raised the legal presumption that entrymen and officers alike had complied with the law. They were notice to the Detroit Company of the power of the Land Department to avoid them for fraud or error before the patents were issued, and of no other defect or danger, and the authorities cited for complainant express no different opinion. The Detroit Company took its equitable title to the timber subject to this notice, and subject to the possible exercise by the Land Department of this power. That department exercised the power, as the legal presumption was that it would exercise it, by affirming the validity of the voidable titles and by issuing the patents upon them. Here the effect of the notice from the purchase of the equitable titles ceased. The only reason that purchase gave notice of a voidable title was the fact that it did not acquire the legal title. The moment the legal estate inured to the benefit of the Detroit Company by the issue of the patents without notice of any fraud or irregularity in their procurement, its defense of a bona fide purchase was complete. It contained every essential element

of a complete defense except the legal title before the patents were delivered. It was the lack of the legal title, and that alone, that made its defense vulnerable in the Land Office. When the patents had issued, the power of the Land Department had ceased, and the Detroit Company's position was conditioned by every attribute of that of a bona fide purchaser. Conceding that the indispensable elements of such a defense are absence of notice of the fraud or defect, good faith, payment of value, and the legal estate, it is not material at what time or in what order the purchaser acquires them. It is only necessary that they all concur in him at the same time. It is indispensable to this defense that the consideration should be paid before notice of the defect. But it is not essential that it should be paid before or at the time the title is conveyed. It is sufficient if the payment is completed at any time before notice of the defect is received. It is not more essential that the legal title should be secured before or at the time when the consideration is paid. It is enough if it is acquired before notice of the alleged fraud or perjury is fastened upon the purchaser.

The legal title to the timber upon 13 of the tracts in dispute vested in the Detroit Company on January 14, 1901, when it purchased of the Martin Company. Its defense to the attack upon the title to the timber upon these tracts did not, however, become complete until April 22, 1901, when it finished its payment of the purchase price of the property. Its title then became unassailable at the suit of the government for fraud or perjury which induced the issue of the patents. U. S. v. Winona & St. Peter R. Co., 15 C. C. A. 96, 109, 67 Fed. 948, 961; U. S. v. Burlington & M. R. Co., 98 U. S. 334, 342, 25 L. Ed. 198; U. S. v. California & Oregon Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, 37 L. Ed. 354. On May 9, 1901, four months before it received any intimation of any defect in its title and eleven months before this suit was instituted, the patents to the other 31 tracts had issued, and the legal estate in the timber upon them had been vested in the Detroit Company. The purchase price had been paid in full. The legal title had been acquired. No notice of any fraud or perjury in the inception of, or of any defect in, the title which it had bought, and which had passed from the complainant to it when the patents were issued (Sandels & H. Digest, § 699), had been received. Why was not its defense that it was a bona fide purchaser impregnable? No satisfactory answer to this question has occurred to us, and our conclusion is that one who purchases in good faith and pays value for the equitable title to land of the government evidenced by the receiver's final receipt, and who subsequently, and before receiving notice of any fraud or defect in his title, acquires the legal estate through the issue of the patent, is a bona fide purchaser, and his title is unassailable at the suit of the United States to avoid the patent for fraud or perjury of the immediate or r mote grantors of the purchaser. Colorado Coal Co. v. U. S.. 123 U. S. 307, 309, 322, 8 Sup. Ct. 131, 31 L. Ed. 182; U. S. v. Clark (C. C.) 125 Fed. 774, 776.

Finally, this is a suit in equity. The equitable claims of the United States appeal to the conscience of a chancellor with the same, but with no greater or less, force than would those of an individual in like circumstances. Bona fide purchasers are the especial favorites of courts

of equity. In Boone v. Chiles, 10 Pet. 177, 209, 9 L. Ed. 388, Mr. Justice Baldwin, in delivering the opinion of the Supreme Court, said:

"A court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can attach upon it so as to give any jurisdiction. Sugd. Vend. 722. Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser who has put himself in peril by purchasing a title and paying a valuable consideration without notice of any defect in it or adverse claim to it; and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief (9 Ves. 30–34), which a court of equity imparts liberally."

Conceding now, for the purpose of the remainder of this discussion, that the Detroit Company purchased and paid for the equitable estate evidenced by the final receipts in the first instance, and that it did not acquire the legal title until the patent issued, what has that company done to taint the conscience of any one, or to entitle the government to any relief against it in this suit? The record discloses nothing. The general rule in chancery is that, where equities are equal, the defendant prevails; that it is only when the case of the complainant appeals to the conscience of the court with the greater force that it will interfere to grant relief. St. Johnsbury v. Morrill, 55 Vt. 165, 169; 2 Pom. Eq. Jur. § 739; Colyer v. Finch, 5 House of Lords Cas. 694, 706; Medlicott v. O'Donel, 1 Ball & Beatty, 156, 171. Here the equity of the government is far less persuasive than that of the Detroit Company. The former has received and still retains $17,000, the purchase price which it fixed for these lands; and it asks this court that the timber upon them, which constitutes their only real value, be taken from the defendant, which has innocently bought and paid for it, and restored to the complainant. It issued its final receipts, which were prima faci~ evidence of a right in the grantees therein named to the title to these lands, and the Detroit Company purchased and paid for the timber upon them in reliance upon these certificates, without notice of any fraud in their procurement. The company seeks no relief, but prays only that it be permitted to retain that which it bought and paid for in good faith, while the complainant seeks to keep the purchase price of the property which it sold and to recover back the property itself. The equity of the defendant is the stronger. Not only this, but the Detroit Company has added to its equitable title the legal estate in the timber. Where equities are equal, the law must prevail. A court of equity will not interfere at the suit of the holder of a prior equitable title or claim to deprive the innocent purchaser for value of a junior equitable estate of equal strength of a legal title which he has subsequently bought or obtained after notice of the defect. It will not disarm a bona fide purchaser, or take from him the shield of any legal advantage. 1 Story, Eq. Jur. (13th Ed.) § 64c; 2 Pom. Eq. Jur. § 766; Bosset v. Nosworthy, 2 Leading Cases in Equity (4th Ed.) 71; Bayley v. Greenleaf, 7 Wheat. 46, 57, 5 L. Ed. 393; Lea v. Polk County Copper Co., 62 U. S. 493, 498, 16 L. Ed. 203; Dueber Watch-Case Mfg. Co. v. Dougherty, 62 Ohio St. 589, 596, 57 N. E. 455; Zollman v. Moore, 21 Grat. 313, 321. In Dueber Watch-Case Mfg. Co. v. Dougherty, one Coburn held stock in the company, for which he had paid nothing, and which he had agreed to transfer back to the corporation. While this stock

stood in his name he induced Dougherty and another to indorse his note by making an agreement with them that he would subsequently transfer the stock to them as collateral security for his liability to them upon their indorsement. At the time when the indorsement was made the indorsers had no notice of the right of the company to the stock, but they received notice of that right before Coburn assigned the stock to them. After this notice Coburn made the assignment. The court sustained the claim of the indorsers, and said:

"And here it will be observed that the claim of the company is not that of an innocent purchaser for value. Its claim is that of a mere equity for a reconveyance, prior in time, to the equity of the plaintiffs. The contest is simply between equities. In such cases the settled doctrine is stated by Pomeroy to be 'that, if a second or other subsequent holder, who would otherwise be postponed to the earlier ones, obtains the legal estate, or acquires the best right to call for the legal estate, he thereby secures an advantage which entitles him to priority. It is absolutely essential that he should have acquired his equitable interest without any notice of the prior claims.' Pomeroy, Eq. § 727; also section 729; Adams, Eq. 161, 162. * * * The plaintiffs seem to be clearly within the rule here stated. They had no knowledge of the company's claim when they acquired their equity, and had a right to protect it by taking an assignment of the stock for that purpose, which they did on January 7, 1892, though at that time they had knowledge of the company's claim. This gives to them an unquestioned priority over the company, and the right to a sale of the stock for the satisfaction of their claim."

The case at bar falls far within the rule which these cases illustrate, and differs from them only in the fact that the Detroit Company not only received no notice of the alleged fraud before it purchased its equitable estate, but it received no notice of it until it had also acquired the legal title to the timber.

For the reasons which have now been stated, perhaps at too great length, the United States is not entitled to recover from the Detroit Company the timber which it purchased, to enjoin it from removing that timber from the lands, or to avoid the conveyances which vested the title to the timber in the company.

For the same reasons the government is not entitled to a decree avoiding the patents or the subsequent conveyances of the 27 tracts of land which the Detroit Company purchased and obtained deeds of from the entrymen and entrywomen before it had notice of any defects in the titles, and before this suit was commenced.

There remain 17 tracts of land the title to which still stands in the original applicants and patentees. The Detroit Company owns the timber upon these lands, and has the right to remove it according to the terms of the timber contracts. The land without the timber is of little, perhaps of no, value. The evidence in this record has convinced, not that these applicants made any agreements by which the title which they might acquire should inure to the benefit of any person except themselves, but that each one of them applied to enter the lands he or she obtained on speculation for the use and benefit of the Martin-Alexander Lumber Company and not in good faith to appropriate it to his or her own exclusive benefit. The salient facts which were proved in this case and which have forced our minds to this conclusion appear in the statement which precedes this opinion, and no good purpose would be subserved by restating them here.

The decree below is accordingly reversed, and the case is remanded to the Circuit Court, with instructions to enter a decree to the effect that the patents issued to the defendants John H. Scott, Thomas J. Clements, Jim P. Copeland, John H. Wilson, Robertson C. Gregory, Martha Gregory, Joseph O. Means, Archibald G. Winslow, Caroline H. Means, Emma Winslow, James F. Patterson, Gus C. Copeland, George T. Colston, Henry Jones, Sherman Garrison, Barbara Garrison, and Bill D. Copeland be avoided, with costs in favor of the United States against them and the Martin-Alexander Lumber Company, and that the complainant is entitled to no relief against the Detroit Timber & Lumber Company, and the bill against it and the other defendants not named above be dismissed, with costs. It is so ordered.