## UNITED STATES v. LONABAUGH et al.

### (District Court, D. Wyoming. July 19, 1907.)

1. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES—SECURING TITLE TO PUBLIC LANDS.

A conspiracy to induce the Land Department of the United States by fraudulent means to dispose of public lands in a way not authorized by the statutes is one to defraud the United States, within the meaning of Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], although it receives payment for the lands and suffers no pecuniary loss, and, if accompanied by an overt act, is indictable under said section.

2. STATUTES—CONSTRUCTION OF PENAL STATUTES.

Although penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of Congress, and this intention is to be collected from the words employed in the statute.

·[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 322, 323.]

3. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES — ENTRY OF COAL LANDS.

Under the coal land statute (Rev. St. § 2350 [U. S. Comp. St. 1901, p. 1441]), which expressly provides that only one entry of coal lands shall be allowed to the same person or association of persons, and that no association of persons, any member of which shall have taken the benefit of the statute, either as an individual or as a member of any other associa-

tion, shall enter or hold any other lands under its provisions, any agreement, the purpose of which is to evade such provisions and to secure indirectly lands which could not be secured directly thereunder, constitutes a conspiracy to defraud the United States, within the meaning of Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676].

4. PUBLIC LANDS—EQUITABLE TITLE—EFFECT OF FRAUDULENT ENTRY.

The rule that where one has lawfully and in good faith made an entry of public lands and has obtained his final receipt he is vested with the equitable title thereto, and may make a valid conveyance thereof, is not applicable where the entry was not in good faith, but in fraud of the law, since in such case the equitable title did not pass to the entryman.

5. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES—UNLAWFUL ENTRY OF COAL LANDS.

Defendants entered into an agreement, the purpose of which was to obtain title to a large tract of coal lands from the United States and to vest such title in a company organized by them for the purpose. Pursuant to such agreement, they procured third persons to make individual entries under the statute which were secured by false testimony. Defendants furnished the money to pay for the lands, and, when final receipts were obtained, they took the same, paid small sums to the entrymen, and took deeds from them to the company. *Held*, that such agreement was a conspiracy to defraud the United States, within the meaning of Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676].

6. CRIMINAL LAW—LIMITATION OF PROSECUTIONS—COMMENCEMENT OF PERIOD OF LIMITATIONS.

The offense in such case was not complete until the final receipts held by defendants were surrendered and patents obtained, from which time only the statute of limitations began to run.

7. SAME—HOMESTEAD ENTRY OF COAL LANDS.

A conspiracy to secure the title to coal lands from the United States through a homestead entry may constitute a conspiracy to defraud the United States, within Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], although such lands are not subject to lawful homestead entry, where the title is secured by means of false proofs.

## On Motion for New Trial.

Sylvester R. Rush and Timothy F. Burke, U. S. Attys.
John W. Lacey, Gibson Clark, and N. K. Griggs, for defendants.

RINER, District Judge. Numerous grounds are set out in the motion for a new trial and were argued by counsel with distinguished ability. I shall not attempt, in disposing of the motion, to discuss them separately. Two principal questions are presented: First, whether the acts which the defendants are charged with conspiring to do, would amount to a fraud upon the government if carried out; and, second, if a conspiracy is established, when was the offense complete? The first question may be disposed of in a word, for it was admitted at the argument, as I understood counsel, that in order to bring the defendants within the meaning of section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676], the words "conspiracy to defraud the United States" do not necessarily mean that there shall be pecuniary loss or damage to the government, resulting from false representations made to its officers in the performance of their duties, but that any false practice or trick set in motion for the purpose of inducing the government officials, in executing the laws of the United States in cases where they must act upon statements made by the parties interested, to act in a way which would be unlawful if the real truth were known, is a fraud

upon the government. If any doubt heretofore existed upon that question, it has been forever set at rest by the decisions of the Supreme Court of the United States. The court in the case of Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90, said:

"Whatever may be the rule in equity as to the necessity of proving an actual loss or damage to the plaintiff, we think a case is made out under this statute by proof of a conspiracy to defraud and the commission of an overt act, notwithstanding the United States may have received a consideration for the lands and suffered no pecuniary loss."

There are other cases where the Supreme Court has given expression to the same views, so that I think it may be said to be settled that, where the proof shows a conspiracy to defraud and the commission of an overt act, it matters not that the government was paid its price for the land. Whenever it is made to appear that the wrong disposition of the public lands was induced by fraudulent practices on the part of the party charged therewith, and done for the very purpose of circumventing the law and warping its due administration, the United States is defrauded. I think there can be no question in this case that there was such a conspiracy or unlawful agreement on the part of these defendants, and its very purpose was to induce the land department of the government, which is charged with the disposition of public lands, to dispose of the lands described in the indictment in a way not contemplated by the statute, and in violation of the statute. They knew that no individual could acquire more than 160 acres of land, and that an association or corporation could not acquire more than 320 acres, except in one case, for which the statute clearly provides, for such is the plain provision of the statute. But it was urged in argument that because the statute does not in express terms require an affidavit that the entryman is not taking the land for the benefit of another that, therefore, he may lawfully make a contract to sell or convey by deed, if not prior, certainly subsequent, to his making final proof. While it is undoubtedly true that penal laws are to be construed strictly, yet the intention of Congress must govern in their construction. If a case be within the intention it must be considered as within the letter of the statute. In other words, although penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of Congress, and this intention is to be collected from the words employed in the statute. Where there is no ambiguity in the words, there is no room for construction. A case would have to be a strong one indeed which would justify a court in departing from the plain meaning of words, especially in a penal act, in searching for an intention which the words themselves did not suggest. As was well stated by the Court of Appeals for this circuit in the case of Swarts v. Siegel, 117 Fed. 18, 54 C. C. A. 404:

"Attempted judicial construction of the unequivocal language of a statute or of a contract serves only to create doubt and to confuse the judgment. There is no safer or better settled canon of interpretation than that, when the language is clear and unambiguous, it must be held to mean what it plainly expresses, and no room is left for construction."

The coal land laws (section 2350 [U. S. Comp. St. 1901, p. 1441]) provide that only one entry shall be allowed to the same person or association of persons; and an association of persons, any member of which shall have taken the benefit of such sections of the statute (that is, the sections which contain the provisions allowing them to enter coal lands) either as an individual or as a member of any other association, is prohibited from entering or holding any other lands under the provisions of those sections. So that when these defendants attempted to secure the lands described in the indictment in the manner disclosed by the evidence in this case they knew that they were committing a fraud, because the very agreement itself provides for doing indirectly what they, as individuals or as members of an association or corporation, could not do directly.

In the determination of the second question, it is necessary to look to the object and design the parties had in mind when they entered into this unlawful agreement. What was the object and purpose of the agreement? Merely by false affidavits to get the government to convey the land described in the indictment to the different entrymen and stop there? I think no one will contend for a moment that they had any such purpose in mind. The purpose and design was not only to do that, but by the same methods to vest the title in this corporation, organized by them for the sole purpose of taking the title. But it was insisted, as I understood counsel, that upon final proof and the issuance to the entryman of a certificate of final payment by the receiver, regardless of the question of fraud in securing the entry, the final certificate conveyed as against the United States the apparent title and right of possession, that the entryman had a right to convey, and that the United States in order to reinvest the title in itself must institute judicial proceedings to set aside the apparent or defeasible title vested in the entryman or other grantees. I do not so understand the law. It would. it seems to me, open wide the door for the perpetration of frauds of various kinds in the sale and disposition of public lands. The conveyance, it may be true, conveyed such title as the entryman had, but what title did he get? The proofs offered were false and fraudulently made, for the very purpose of misleading the government to part with its title to the lands described in the indictment. I have examined with care every case to which my attention was called during the oral argument. Most of them are civil cases, and I think in all of them (except one or two, where rights of bona fide purchasers without notice of the fraud were involved) the entries up to and including the final receipt were made in good faith and in strict conformity with the law, and in determining the question here presented the distinction between such cases and entries made in fraud of the law, although otherwise regular in form and procedure, must be kept constantly in mind. In the former cases vested rights may be said to accrue upon performance of the conditions required by law. In the latter, no vested rights can be acquired by the entryman however regular in form the proceedings may have been. It may well be conceded that in all cases where the entryman has acted in good faith and has fully complied with the provisions of the statute, has not been guilty of any fraud, and has done no act

inconsistent with the law, he has acquired a right of which he cannot be deprived, because as was said by the Supreme Court in the pre-emption case of Myers v. Croft, 13 Wall. 291, 20 L. Ed. 562, "The object of Congress was attained when the pre-emptor went with clean hands to the Land Office and proved up his right and paid the government for his land." But it would, it seems to me, be to violate every principle of interpretation to declare that such authorities support the views so earnestly contended for here. The rule is well stated by Judge Shiras of this circuit, in the case of United States v. Steenerson, 50 Fed. 504, 1 C. C. A. 552. After citing several decisions of the Supreme Court, which he said were called to his attention by counsel, in which it was held that when the right to a patent of lands has once become vested in a purchaser or pre-emptor, the same are segregated from the public domain, are no longer subject to entry, and the vested right to the patent thereto is equivalent to a patent actually issued. He then adds:

"The principle on which these decisions are based is that when a homesteader or pre-emptor has, in good faith, performed all the acts which, under the provisions of the statutes of the United States, are necessary to complete his right to the land, then he becomes, equitably, the owner of the same, and the United States holds the naked legal title as a trustee for his benefit. For the protection of his rights, thus acquired, it is held that in a contest involving the title of the land an established right to a patent will be deemed to be the equivalent of a patent. This rule, however, has been adopted solely as a means for the protection of those who have, in good faith, established a right to a patent by performance of the requisite conditions. The final certificate or receipt acknowledging payment in full, and signed by the officers of the local land office, is not in terms nor in legal effect a conveyance of the land. It is merely evidence on behalf of the party to whom it is issued. In a contest involving the title to land, wherein a person claims adversely to the United States, it is open to such claimant, notwithstanding the legal title remains in the United States, to prove that by performance on his part of the requisite acts he has become the equitable owner of the land, and that the United States holds the legal title in trust for him, but as the claimant in such case has not received a patent or formal conveyance, and has not become possessed of the legal title, he is required to show performance, on his part, of the acts which, when done, entitle him, under the law, to demand a patent of the land. When evidence of this kind is offered on behalf of the claimant it is open to the United States to meet it by proof of any fact or facts which, if established, will show that the claimant has not become the real owner of the realty. If it be true, in a given case, that the entry of the land was not made in good faith, but in fraud of the law, certainly it cannot be said that the claimant has become the equitable owner of the land, and that the United States is merely a trustee holding the legal title for his benefit. Fraud vitiates any transaction based thereon, and will destroy any asserted title to property, no matter in what form the evidence of such title may exist."

There can be no question, I think, in the mind of any one who heard the testimony, that if the real facts, as disclosed by the record in this case, had been presented to the Land Department, prior to the issuance of the patent, that each and every entry here involved would have been canceled.

The case of Hawley v. Diller, 178 U. S. 476, at page 490, 20 Sup. Ct. 986, at page 991, 44 L. Ed. 1157, approves of the conclusion reached by Judge Hawley, to the effect that the result of the decisions of the Supreme Court were (1) that the Land Department of the government has the power and authority to cancel and annul an entry of public

land when its officers are convinced, upon a proper showing, that the same was fraudulently made; (2) that an entryman upon the public lands only secures a vested interest in the land when he has lawfully entered upon and applied for the same, and in all respects complied with the requirements of the law; (3) that the Land Department has control over the disposition of the public lands until a patent has been issued therefor and accepted by the patentee. While it is undoubtedly true that in all cases where an entryman has, in good faith, performed all the acts which, under the provisions of the statutes of the United States, are necessary to complete his right to the land, the courts will hold that he becomes equitably the owner of the same, and for the protection of his rights thus acquired in a contest involving the title of the land, that an established right to a patent will be deemed to be equivalent to a patent, but, as suggested by Judge Shiras, if in a given case it shall be made to appear that the entry was not made in good faith, but in fraud of law, certainly it cannot be said that the claimant has become equitably the owner of the land, and that the United States is merely a trustee holding the legal title for his benefit.

The case of United States v. Detroit Lumber Company, 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, and Id., 131 Fed. 668, 67 C. C. A. 1, is not in point. In that case the rights of a bona fide purchaser were involved, the Detroit Company having purchased most of the land after the issuance of a patent therefor, and dealt directly with the patentees. And it was admitted that at the time of the purchase it had no knowledge or suspicion of wrong in the titles, and the court held that as to these tracts it was strictly a bona fide purchaser. It distinguishes, but does not overrule or modify, the decision in Hawley v. Diller, and prior cases to which I have referred.

The object of this conspiracy, as disclosed by the evidence, as I have already suggested, was not only, by false testimony, to induce the government to part with its title to the entrymen and entrywomen, but also to vest the title in this holding company, which the defendants had formed for the purpose of taking the title; so that at the time the final proof was made the object of the conspiracy had not been accomplished. They at that time and at the time the conveyances were made held only such title as the entryman had acquired, and something further was necessary in order to take the land out of the control of the Land Department and vest the title thereto in the coal company, namely, the patent. The patent could be obtained only upon the surrender of the final receipts which in all cases, with perhaps one exception, were in the hands of Mr. Lonabaugh, one of the parties to this unlawful agreement. So that the surrender of these receipts and the receiving and recording of the patents must, I think, be held to be acts to effect the object of the conspiracy, and as these acts all occurred within less than three years prior to the time of finding the indictment, it cannot be said that the statute of limitations has run. It seems to me that if a prosecution can be maintained under this statute the government has here made a case. All of these entries or purchases were made subsequent to the agreement offered in evidence. I say "entries," because the declaratory statement is not, I think, in any sense, a part of the entry or purchase. It is a mere declaration that within a certain time

the party will or expects to purchase, and for the time specified in the statute gives him a preference right to purchase, but unlike a filing, if he fails to proceed within the time limited, no action is necessary on the part of the Land Department. Any other person may come in and, after the expiration of the time of his preference, purchase the land and procure title thereto. These purchasers were all secured by Lonabaugh pursuant to the agreement. Holbrook furnished the money to pay for the land; the entrymen and entrywomen in some cases did not even know where the land was, and as one of these women testified that, while she had been over the country generally, she did not know the particular land upon which her filing was made; she did not know what papers she signed; she did not know what amount of money was paid for the land or who paid for it; and that all she knew about it was that she signed such papers as were presented to her by Mr. Lonabaugh and received therefor the sum of $100. The record discloses that the papers she signed were a declaration, a final proof and a deed conveying the land to the Wyoming Coal Mining Company. The same facts are disclosed as to almost all of the entries, except that in some cases the entryman received $500, and in the case of the Roberts' homestead, the testimony shows, as I recall it, that he received $800.

It further appears from the testimony that as late as January, 1907, Mr. Holbrook carried away and secreted the books of the coal company, showing these transactions and the amount of money paid out in connection therewith, so that the secretary of the company was unable to comply with the requirements of a subpoena served upon him to produce these books for inspection at the trial. To hold that a case is not made out upon such facts would be to hold that the provision of the statute limiting the amount of coal land to be taken under the provisions of the act, by an individual or association, means nothing. In other words, in order to avoid the provisions of this statute, all a man would have to do after exhausting his own right would be to hire some one who had not exhausted his right to make the entry for him, the man desiring the land paying all of the expenses in connection therewith. Such, I think, cannot be the law. U. S. v. Trinidad Coal Company, 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640.

It was insisted at the argument that the court erred in submitting the second count of the indictment, which related to the homestead entry of Thomas E. Roberts, to the jury. The record discloses that, while the homestead application was filed prior to the agreement entered into between Lonabaugh and some of the other defendants, the proof was not made until after the agreement, although it was included in the agreement, and that the defendant Robert McPhillamey acted as one of the witnesses. Roberts testified in his affidavit, which was admitted in evidence without objection, that about a month after he had filed on the land, Robert McPhillamey told him that the probabilities were that the country all around there contained coal, and that the land he had filed on might be valuable some day; that Jesse McPhillamey furnished the shack which was placed upon the land, stating to Roberts that it would not cost him a cent, and that he could use his (McPhillamey's) team for hauling it onto the claim. He fur-

ther testified that he had lived upon the land but six days; that after he had made final proof the receipt went to clerk Holmes, and the clerk turned it over to E. E. Lonabaugh. He also testified that later he demanded the receipt from Holmes and Lonabaugh, but they refused to give it up, and soon thereafter he conveyed the land to Jesse McPhillamey for $800. He further testified that he informed McPhillamey at the time the deed was made that he had no receipt and no patent, and McPhillamey replied: "That is all right, Lonabaugh has the receipt." He said he did not know who the grantee was, but that he had signed the deed, and was paid $800, and he thought the land went to Jesse McPhillamey, but was not sure. That the proof in this case was false, there can be no doubt. The defendant Robert McPhillamey who was one of the witnesses, testified that actual settlement on the homestead was made February 16, 1902, and that the claimant had resided continuously on the homestead since he first established his residence thereon. This testimony was given on the 27th of November, 1903, and the testimony of Roberts is that he never lived upon the land but six days. The claimant in his testimony, when asked for what period or periods he had been absent from the homestead, replied, "None," but in his affidavit, made on the 22d of March, 1907, testified that he had only lived upon the land six ·days. That this entry was fraudulent and was a part of the scheme to defraud is, I think, abundantly shown by the record. McPhillamey, although he had advised the claimant that the land was probably valuable for coal, acted as one of his witnesses, and the final receipt was at once turned over to the defendant Lonabaugh, and was followed soon thereafter by a conveyance from the entryman to Jesse McPhillamey and from Jesse McPhillamey to the Wyoming Coal Mining Company. And thereafter, when the patent was issued and ready for delivery, Lonabaugh sent the final receipt to the Land Office at Buffalo, and received the patent. To show that this was a fraud upon the government, I need not do more than to call attention to the case of Royal B. Stearns v. United States (decided by the Court of Appeals for this circuit) 152 Fed. 900, 82 C. C. A. 48. In that case, Judge Van Devanter, in the course of his opinion, said:

"Not all public lands are subject to homestead entry, but it does not follow that attempts to make homestead entries of such as are excepted from that mode of disposal are never effective. When the exception turns upon a question of fact, such as whether the lands contain valuable coal or mineral deposits, the determination of which is committed to the land officers and must rest upon proofs outside the records, it is always possible for applicants, by making false proofs, to impose upon these officers and secure the allowance by them of homestead entries of lands of the excepted class. Of course, such entries are fraudulent, but, being allowed in the exercise of a lawful authority, they are not void, but voidable merely, and may be the means of defrauding the United States. Citing numerous authorities. And they may also be fraudulent for other reasons, applicable to all original homestead entries, as where they are made in pursuance of collusive agreements by the applicants to give to others the benefit thereof, or are made by persons who falsely represent themselves as possessing the requisite qualifications when they do not possess them."

It was also insisted that the court should have given to the jury the instruction requested by the defendant, to the effect that if they

158 F.—21

found that the lands mentioned in the indictment were entered and proved up on by the entryman in good faith, in their own interest, and after being proved up on were sold, that would not constitute a violation of the law. There was no evidence upon which to base such an instruction. The entire evidence offered upon the trial of the case tended to show bad faith and a deliberate attempt to defraud upon the part of every person connected with the transaction. The only reason that can be given for such an instruction is that the law presumes that the transaction was made in good faith until the contrary is made to appear, and upon that question I think the instruction given to the jury by the court was as favorable to the defendants as they had a right to ask. Some other questions were ably argued by counsel, but to comment upon them in detail would carry this memorandum to unwarranted length.

From what I have already said, it follows that the motion for a new trial should, in the opinion of the court, be denied, and it is so ordered.