REED v. MUNN et al.

IBEX MINING CO. v. MUNN et al.

MUNN et al. v. IBEX MINING CO. (two cases).

(Circuit Court of Appeals, Eighth Circuit. November 16, 1906.)

Nos. 1,713, 1,890, 2,319, 2,320.

1. EQUITY—DECREE MUST CONFORM TO THE BILL OF COMPLAINT.

Where a bill in equity seeks to enforce an unrecorded trust interest in a mining claim, the legal title to which is in an assignee of the locator, under a syndicate agreement, to the constitution of which the bill alleges the cestui que trust assented, held, to be error to decree a revocation of such conveyance, and to revest the title to the mine in the cestui que trust, as he had waived his right to reclaim the mine itself. His recovery should be limited to his share in the proceeds of the lease and sale under the syndicate agreement.

2. TRUSTS—ENFORCEMENT—EVIDENCE.

Where the locator of a mining claim has conveyed the legal title thereto to A., who is alleged to have executed back to the grantor an agreement to account to him for a certain interest therein, such agreement being unrecorded, and 14 years after the legal title had so passed from such trustee to third parties such beneficiary sues to enforce the trust, held, that he must present such proofs as to satisfy fully the judgment and conscience of the court, both of the existence of the trust and the essential terms thereof.

3. SAME—INCONSISTENCY AND CONTRADICTION IN SUCCESSIVE BILLS OF COM-PLAINT.

Claim of notice of such trust to subsequent creditors and purchasers is greatly weakened where it appears from successive bills of complaint that when the suit was first brought the facts sworn to failed to state sufficient grounds for relief, and set out a claim inconsistent with that ultimately pleaded; as it should not be expected that subsequent purchasers and creditors should have notice of more or different facts than were known to the suitor when he swore to the first bill.

4. SAME—ACTIVE TRUST—LEGAL CHARACTER OF CONSOLIDATION AGREEMENT.

Where the claimants of conflicting locations of mining property, in order to adjust the controversy among themselves, conveyed to a designated trustee under a written agreement, specifying the proportion of the respective interests of the owners, with authority in the trustee to lease or sell the property upon the written request of two-thirds in value of the beneficial owners, held, that such agreement, under the rule in Brandies v. Cochrane, 112 U. S. 344, 5 Sup. Ct. 194, 28 L. Ed. 760, constituted an active trust, as distinguished from a mere trust power.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, § 178.]

5. EXECUTION—PROPERTY SUBJECT—INTEREST IN REAL ESTATE.

As, under the statute of Colorado, mining locations are declared to be real estate, and under the statute, and decisions of the Supreme Court of the state every interest in land, legal and equitable, is subject to levy and sale under execution, held, that the equitable interest of the beneficial owners under said trust agreement was subject to seizure and sale under execution, and the purchaser under sheriff's deed acquired the interest of the beneficial owner under the consolidation agreement.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Execution, § 91.]

6. SAME—SUFFICIENCY OF DESCRIPTION OF PROPERTY UNDER EXECUTION AND LEVY.

Any description of property under sheriff's levy and sale is sufficient which, taken as a guide, will point the way to the land, and easily en-

148 F.—47

able the inquirer to identify it. Even parol testimony may be resorted to
to aid the identification. Description in this case *held* sufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Execution, § 334;
vol. 20, Evidence, § 2115.]

7. SAME—TRANSFER OF BID AT SHERIFF'S SALE.

The successful bidder at sheriff's sale may transfer his purchase to
another, who becomes the recipient of the sheriff's deed; but such trans-
feree acquires no better title or right than the bidder would have ac-
quired under the deed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21; Execution, § 828.]

8. SAME—NOTICE OF EQUITABLE INTEREST TO SUBSEQUENT PURCHASERS AND
CREDITORS.

Where notice of an outstanding equitable interest in property sold under
execution is not obtained until after judgment lien has attached, sale
made, and purchase money paid, *held*, not to be sufficient to affect the
title of the purchaser, although sheriff's deed is not made until after such
notice.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Execution, §§
781, 783, 785.]

9. VENDOR AND PURCHASER—PURCHASER WITH NOTICE UNDER PURCHASER
WITHOUT NOTICE.

*Held* to be a bona fide purchaser for value, as he succeeds to the position
of the first innocent purchaser.

10. SAME—VALUABLE CONSIDERATOIN DISTINGUISHED FROM AN. ADEQUATE
CONSIDERATION.

Although a purchaser from one who, by reason of financial distress.
may feel compelled to sell his property at a sacrifice, yet, if the transac-
tion is free from duress, deceit, or fraud on the part of the purchaser, and
he pays a valuable consideration therefor, although he may not pay an
adequate price for the property, the transaction is not assailable by a
stranger on the ground that such purchaser is not a bona fide purchaser.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Pur-
chaser, §§ 567, 572.]

11. CORPORATIONS—NOTICE OF EQUITABLE CLAIM TO A PURCHASING CORPORA-
TION.

To affect a corporation acquiring the legal title to real estate with notice
of an outstanding equitable claim, knowledge thereof to a stockholder
or director prior to the organization of the corporation will not ordinarily
affect the corporation; and such knowledge on the part of a director after
the organization of the corporation will not bind the corporation unless
such director receive such notice either while acting for the corporation
or under circumstances which, in fidelity to the company, it was his duty
to impart to it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§
1750–1752, 1757.]

12. VENDOR AND PURCHASER—BONA FIDE PURCHASERS—THE TRUE EQUITY
RULE.

As applied to the facts of this case, courts of equity will not impute
to a purchaser for a valuable consideration notice of an outstanding
equity, unless the circumstances are such as to warrant the court in say-
ing, not only that he might have acquired, but also that he ought to have
acquired, it but for his gross negligence in the conduct of the business in
question. It is not sufficient that he had the means of obtaining, and
might with prudent caution have acquired, the knowledge, but whether
the fact of not obtaining it was culpable negligence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and
Purchaser, § 477.]

13. MINES AND MINERALS—QUALITY OF A MINING LOCATION.

The locator of a mine, without obtaining patent, acquires the possessory

title thereto against all the world and against the government so long as he performs the annual amount of work thereon. This title passes to the purchaser under him, who, as the apparent owner, holds it against the unrecorded equitable claim or interest therein, without notice. Between such claimant of a prior equitable interest and the subsequent purchaser of the legal title of the locator, the latter has the prior equity.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, § 68.]

14. LANDLORD AND TENANT—RIGHT OF LESSEE TO BUY IN TITLE OF LANDLORD.
A lessee has the right to purchase the landlord's title at execution sale, or to acquire by deed through the landlord the fee, and thereby put an end to the relation of landlord and tenant.

15. EQUITY—LACHES.
Doctrine of laches applied to the facts of this case.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Colorado.

The above-entitled causes grow out of one controversy, and are so allied that they may be considered and disposed of in one opinion. The controversy grows out of the claim of N. A. Munn and R. G. Munn to an alleged equitable interest in what is termed the "Independence Lode," or mining claim, located at Leadville, Colo. For convenience the said Munns will be designated in this statement and the discussion as the complainants, and the other parties to the litigation as the defendants. In 1878 the complainants, by discovery and location, became the owners of an undivided one-half interest in said mine. J. S. Brown, Jr., and Charles Johnson were the like owners of the other half, in the proportion of one-fourth each. This location was soon checkered over with other conflicting claims, and became the prolific source of strife and litigation, rendering the development and operation of the mine, if not impracticable, of little certainty and profit; so that in 1879 the complainants executed to one Cartwright a full power of attorney, acknowledged and recorded, authorizing him to sell and convey their interest therein, under an oral agreement that for his services in effecting such sale he should account to them for one-half of the proceeds. Afterwards, in the same year, Cartwright, under said power, conveyed this interest to one James Henshall in fee simple for the expressed consideration of $1,000, receipt of which was acknowledged. This deed was duly acknowledged and recorded. Thus the record title stood until 1881, when on account of the complications and litigation growing out of the various conflicting claims, the parties in interest by deed conveyed to one Clinton Reed their respective claims, including said Henshall; and in September, 1881, entered into what is termed the "Archer Consolidation Agreement," which included some other contiguous allied properties not involved in this litigation. The parties to that agreement were as follows: Clinton Reed, party of the first part, and trustee for said parties of the second part, to wit: John B. Stone, J. P. Van Lice, A. L. Ordeen, James Henshall, James B. Belford, Lewis C. Rockwell, James S. Brown, J. B. Bissell, Thomas L. Darby, Jacob Mack, John Powell, Daniel Powell, John Slattery, Patrick Sullivan, John W. O'Brien, Michael Finnerty, C. Donnelly, John Fox, Peter Hanrahan, R. E. Goodell, William Gilman, Leonard S. Ballau, David A. Gage, Alexis M. Lay, and Newton B. Lord. The agreement witnesseth:

"That whereas, said parties of the second part have conveyed to said party of the first part, as trustee for the purposes hereinafter stated, the following lode mining claims, to wit, the Archer lode, the Independence lode, the San José lode, the Little Stella lode, the General Shields lode, the Burlington lode, the Winnemuch No. 2 lode, and the Uncle Sam lode. And whereas, said parties of the second part have made such conveyances to said Reed for the purpose of consolidating all of said claims and said interests in one property, to be owned by said parties of the second part, as follows: All of said claims are to represent in said consolidation and to be valued for the purposes of such

consolidation at the sum of two hundred and sixty-eight thousand three hundred and thirty-three ($268,333) dollars. Of said sum the Archer, the Independence, and San José lodes are each valued at forty thousand dollars, the Little Stella and General Shields lodes are each valued at twenty thousand dollars, the Burlington, and Winnemuch No. 2 lodes are each valued at the sum of twenty thousand ($20,000) dollars, and the Uncle Sam lode is valued at the sum of sixty-eight thousand three hundred and thirty-three dollars, of which several sums the several owners of said several claims own an interest proportionate to their several shares or interest in the several claims, and, if said trustee shall sell or dispose of the said claims under the direction of two-thirds in value of the owners thereof, he shall pay to the several and undivided owners sums proportionate to their interests, upon the above basis. And the said party of the first part, as such trustee, shall be governed in the sale and disposal of said consolidated property, and in the holding thereof, by the directions of two-thirds in value of the owners thereof, and shall, whenever called upon by such two-thirds in value of the owners thereof, convey said premises or take such steps in reference thereto as they may direct, such direction to be in writing, signed by the said two-thirds in value; it being expressly understood and declared that said property shall be held, disposed of, or sold upon such terms and in accordance with the direction and authority of two-thirds in amount of the owners of said property, and that the amount of interest that each of the several owners have in said several claims shall be determined by what is shown by the records of Lake county to be the interest of such owner in the premises. And it is expressly understood and agreed, and this trust is executed upon the condition, that the said trustee shall be bound to act upon the direction of said two-thirds, notwithstanding any objections of the minority."

In pursuance of said trust arrangement, on the request and direction of the required two-thirds in amount of the owners, said Reed made a lease of said consolidated properties, and on the 28th day of June, 1890, on like request of the beneficiaries, including said Henshall, Reed made a lease thereof to one Campion, for a term of three years, with an option to purchase the same at any time during the term at the stipulated price of $75,000. This lease and option was, on the 18th day of March, 1891, duly assigned by said Campion to the Ibex Mining Company, a corporation organized about the 7th day of March, 1891, which, in the exercise of the right of said option, on the 5th day of February, 1894, elected to make the purchase; and thereupon said Reed, pursuant to the terms of said trust, executed and delivered to the company a deed of conveyance to all of said property. To correct some error in said deed Reed, on the 27th day of June, 1894, made a second deed to the company. The said company by mesne conveyances also acquired said lease of said J. S. Brown and Charles Johnson. Through the efforts of the parties to said consolidation agreement other than said Henshall, patents were obtained to the various mining properties involved, and these titles vested in the Ibex Mining Company. Under said leases the said properties were worked and developed until 1893-94, so that the properties which, prior to the Archer consolidation agreement, had been of little worth, proved to be very valuable and promising. In this condition of affairs, on the 13th day of July, 1894, the complainants, as citizens of the state of Texas, filed their bill of complaint against the Ibex Mining Company, George W. Trimble, Charles Cavender, A. V. Hunter, and J. T. Campion, as directors thereof, and Clara M. Richardson and James Henshall. This bill, after setting forth the discovery and location of the Independence Mining lode and the making of the power of attorney to said Cartwright, charged that, in disregard of his trust, Cartwright, without their knowledge, in July, 1879, entered into some arrangement or agreement with said Henshall, the nature and conditions of which were to them unknown, alleging the fact to be that Cartwright never sold or disposed of their said interest in said mine, and that if he did make a deed to Henshall it was not the sale of their interest in said property, and that no consideration passed to them; that they had believed that Henshall was only a co-owner with them in the Independence lode, not derived from them; that Henshall in 1882-83 told them that he never held their interest in said mine, and they believed their interest

therein remained intact in their name on the records of Lake county until about April 15, 1884, when they learned that the defendants other than Henshall were in possession and taking ore from said claim. Knowledge of the rights and claim of the complainants was charged against the defendants. The prayer of the bill was that the complainants be declared to be the owners and entitled to the possession of an undivided one-half in the Independence mine, and that the defendants account for the ore mined therein. This bill having been held bad on demurrer, the complainants on March 20, 1895, filed an amended bill, in which they took the position that Cartwright, being unable to dispose of and sell said claim, relinquished his interest therein, and entered into an arrangement on their behalf with Henshall in writing, whereby Henshall, for an interest of one-fourth of said claim, agreed to defray all the expenses, to defend and prosecute adverse suits respecting said claim, and to perfect the title thereto; and, in the event he failed to perfect said title, the conveyance from Cartwright should be void and of no effect. It was further alleged that Henshall entered into the Archer consolidation agreement with the consent of the complainants, and that Reed leased the properties to one Campion under the terms of said Archer consolidation trust with their knowledge and consent. Demurrer was filed to this bill, but without action thereon the complainants, on the 3d day of July, 1895, filed a second amended bill, in which said Clinton Reed was joined as a defendant. In this amended bill they, in effect, allege that they, in connection with said J. S. Brown and Johnson, entered into an agreement with said Henshall, by which they were to convey to him their undivided one-half interest in said Independence mine in consideration of his undertaking to perfect the title thereto; that he was to defray all expenses, prosecute and defend all adverse or other suits necessary to that end; that he was also to prosecute action before the Land Office Department to obtain a patent for said mine. It averred that through said Cartwright they made a deed to Henshall, whereupon Henshall in writing executed the agreement to the effect alleged in the first amended bill. They thus asserted an express trust between them and said Henshall, and reaffirmed the statement that through Henshall they entered into the Archer consolidation agreement, and consented thereto. They alleged notice of their claim and rights to the subsequent purchasers, with a prayer for discovery, decree of ownership of the undivided one-half of the Independence lode or mine, and for an accounting. In 1899 one Frank R. Jeffery and Ed. Dale recovered a judgment in the county court of Lake county, Colorado, against said Henshall. The execution issued thereon was levied upon all the right, title, and interest of Henshall standing in the name of said Reed as trustee in said Independence lode and Archer consolidation, under which said interest was sold at sheriff's sale, and bought in in the name of M. M. Jeffery, wife of said F. R. Jeffery, in satisfaction of said judgment. No redemption having been made from such sale within the specified statutory period, the said interest in the premises was duly deeded by said sheriff to said M. M. Jeffery on the 1st day of December, 1890. On the 13th day of May, 1893, Mrs. Jeffery and her husband joined in a deed of conveyance of said property to said James J. Brown for the expressed consideration of $6,000 in hand paid. Upon the same day Brown conveyed by deed said property to the Ibex Mining Company. This title so obtained is assailed by the bill of complaint for reasons that will appear hereafter in the opinion, and notice upon the purchasers thereunder of the trust interest of the complainants in the property is charged.

The defendant Henshall, though duly summoned, made no answer to the bill, and the defendant Cartwright, notified by order of publication, entered no appearance. The other defendants made defense. In his testimony, taken and read in the hearing of the issues, Henshall stated, in respect of the alleged contract between him and said Cartwright, that he was to push the matter of the conflict of claims to a conclusion, to obtain the title and deed of the one-half thereof to the complainants; that they had an understanding that if a sale was made they would be notified and consent to it, and receive their proportion of the purchase money; that in any event they were to get one-half and he one-half of the proceeds whether he carried the litigation through successfully or not, under any disposition that he made of the property; that he could sell it or enter into consolidation agreements with other

properties, or make compromises, and that it was not necessary that he should successfully carry on any litigation in order to have an interest; and testified that he carried out his agreement so as to become entitled to his interest. N. A. Munn testified that he never gave a deed and never heard of a deed until December, 1895, supposing all the time that the title stood in his name. He admitted that he gave a power of attorney to Cartwright, who afterwards brought Henshall to him, saying that Henshall could handle it, and that Henshall made him a proposition to take hold and perfect the title for one-fourth interest, and that nothing else was said. He further testified that Henshall was to go ahead and get a deed from the government; that he knew nothing of any conflicting claims that were put forward against the property except two; that if there was any litigation Henshall was to stand it, and if he did not succeed in obtaining a title he would get no interest, but he would have his interest in whatever he did get. He could not give the contents of the contract between Henshall and Cartwright.

R. G. Munn testified that the contract in his favor was the same as the one made between Henshall and said Brown; that he saw the contract in 1879 in the possession of Cartwright, which was then left in Cartwright's safe; that he never knew of the deed until Henshall told him about it in 1894; that he first heard of the Archer consolidation in 1882. He also testified that he signed the agreement with Henshall; that the contract did not mention the deed to Henshall. His understanding of the alleged contract was that, if Henshall perfected the title, the Munns were to deed to him, and that he still understands the same. Referring to the letter of one of the Munns to Trimble, hereafter mentioned in the opinion, he stated his present idea of the condition of affairs, and that his present understanding is the same as when he wrote said letter. He admitted that Henshall told him their interest had been sold to pay the said debt of Henshall to said Jeffery and Dale; that he looked up Henshall, to see what he had done with the property, long after he knew, according to his testimony, it was in the Archer consolidation and not in Henshall's name. He also testified that he believed in 1894 that his interest had never been deeded to Henshall, although he had been told in 1882 that the property had been transferred to the Archer consolidation. After the amended bill was read to him, he said he still did not know that the deed was made to Henshall, and did not consider that Henshall had ever conveyed to Reed; that he approved the lease, and wished the royalties to be paid for it, and intended his letter to Trimble to be a demand for royalties under the lease made in 1890.

Other important facts will appear in the following opinion.

On the issues joined under the evidence, the Circuit Court, on June 18, 1901, entered decree declaring title in the complainants, and vesting in them an undivided one-half interest in said Independence mine, setting aside the deed made by Reed to the Ibex Mining Company, and the title derived under the sheriff's deed to M. M. Jeffery. The court referred the matter of the accounting to the master, who in his final report awarded to the complainants the sum of $193,448.30, which was affirmed by the court. From the decree finding the issues for the complainants, the Ibex Mining Company and Clinton Reed prosecuted separate appeals, and from the decrees on the accounting both parties prosecuted appeals.

Charles J. Hughes, Jr. (Charles Cavender, on the brief), for Clinton Reed and the Ibex Mining Company.

T. J. O'Donnell and Edwin H. Park, for N. A. Munn and R. G. Munn.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

In view of the allegations of the bill, on which the case was tried, that

Henshall, the unquestioned holder of the legal title of the complainants' interest in the Independence mine, entered into the Archer consolidation agreement with their knowledge and consent, and therefore as their agent, pursuant to the provisions of which Reed, the trustee, conveyed to the Ibex Mining Company, it is remarkable that the Circuit Court should not only have decreed an accounting of the complainants' interest in the ore mined under the operation of the Archer consolidation agreement and by the Ibex Mining Company, but also have devested the company of the title to the undivided one-half interest in the Independence mine, and vested the same in the complainants. "Equity suffers no person to approbate and reprobate the same deed." 1 Kane's Equity, 317; 1 Bell, Com. 146. As said in Newham v. Kenton, 79 Mo. 382, 385:

"It is a great misapprehension to suppose that one cause of action can be stated in a bill of equity, and by some sort of comprehensive flexibility of chancery jurisdiction relief can be administered growing out of a state of facts not embraced within the facts pleaded. The rule that under the general prayer for relief a party may have any relief to which he may show himself entitled is limited to relief founded on and consistent with the facts set out in the bill, and not such as may be proven at the hearing. * * * A party is not entitled to a judgment on a finding of facts different from any theory of the case set up in the petition or answer."

In Phelps v. Elliott (C. C.) 35 Fed. 455, 461, Judge Wallace expressed the rule as follows:

"The proofs must be according to the allegations of the parties, and if the proofs go to matters not within the allegations, the court cannot judicially act upon them as a ground for decision, for the pleadings do not put them in contestation. * * * A party can no more succeed upon a case proved but not alleged than upon a case alleged but not proved."

If, as the bill alleges, Henshall entered into said trust agreement with Reed, in pursuance of which Reed conveyed the interest in Henshall to the Ibex Mining Company, it concluded the complainants as to this title, leaving them to an accounting with Reed as to their interest in any earnings received by him under the leases and their proportion of the purchase price of the sale to said company.

In Johnston v. Standard Mining Company, 148 U. S. 369, 13 Sup. Ct. 588, 37 L. Ed. 480, Mr. Justice Brown said:

"If he assented to the formation of the corporation and to the transfer of the mine to it, he clearly waived his right to reclaim an interest in the mine itself."

Passing beyond this, do the proofs and the law entitle the complainants to any relief whatever against the defendants? The foundation of the suit is the existence and the terms of an unrecorded written contract, not presented in evidence, claimed to have created the relation of trustee and cestui que trust between Henshall and the complainants, alleged to have been executed in 1879, more than 14 years prior to the institution of this suit to enforce it. Where a suitor thus comes into court to enforce the provisions of such an undisclosed trust after such a lapse of time, and in respect of mining property constantly changing hands and shifting in value, under developments resulting from the expenditure of labor and money by its holders, every consideration of

justice demands that he should come with proofs so clear and persuasive as to satisfy fully the judgment and conscience of the chancellor, not only of the existence of the written instrument. but as to its essential terms.    The varying sworn bills of complaint herein and their own testimony show that they themselves, when they first advised their counsel of the facts, did not understand that such a trust instrument as they now claim was given by Henshall to Cartwright.    On the contrary, they averred that they did not know what it was, and denied that Cartwright ever conveyed to Henshall.    The case as stated in the bill merely charged a violation of the confidence reposed by them in Cartwright. No claim was then advanced that Henshall held the legal title under a trust condition that he should render certain services and make certain expenditures, for a half interest, or any interest, in the property.    But under oath they averred that they had believed that Henshall held only as co-owner under an interest acquired aliunde.    Even their own testimony is inconsistent with the allegations of the second amended bill, and is inconsistent with the trust asserted.    How can they expect the court to believe and find that the subsequent purchasers had any notice of an unrecorded, unpublished instrument, containing provisions other than those sworn to by them in February, 1894?    In confirmation of the fact that when they instituted this action the complainants did not understand that any such trust contract existed between Henshall and Cartwright in their favor, set out in the final amended bill, in a letter written by R. G. Munn to George Trimble, one of the defendants, of date April 11, 1894, he stated that:

"I met to-day Mr. James Henshall, who was a resident of Leadville in 1879, and at that time I was prospecting there, and in 1878 I located the Independence claim and had it surveyed and recorded, and afterwards the Little Johnny surveyed across my claim and others done likewise until it and other claims were all in litigation, and in settling I and my father, N. A. Munn, agreed to quitclaim our interest in the Independence, and the agreement was made in the shape of a contract, and the contract was put on record and the amount stipulated in contract.    Now I understand that Judge Belford and Mr. Rockwell and others have all signed quitclaim deeds to the property, and received their compensation.    My father and myself have not signed away our right in the Independence, and as we can only hold the Little Johnny to the amount of the contract on record, with interest from July, 1879, until the present time, I now demand that such amount, with interest, be paid us in full, and as I understand you are one of the principal stockholders in the group of mines of which the Independence is one, I ask you to look after this matter, and advise me at your earliest convenience, and oblige."

The reasonable import of this statement is that the consideration of the quitclaim deed to Henshall for their interest was a stipulated amount, and that they then understood that their only right was to claim "the amount of the contract" against the Little Johnny, with interest. If this information had been conveyed to the Ibex Mining Company before its acquisition of the legal title to the property, it would only entitle them to claim the amount of the purchase price stipulated for the quitclaim deed.

As proof that Henshall himself was not publishing any trust relation respecting this property between him and the complainants, in a letter written by him February 1, 1890, to said Jeffery and Dale, judgment

creditors of his, who evidently had asked him to convey to them his interest in the Independence mine, he said:

"Yours of January 24th only just received on my return from Clear Creek county. I note its contents, and would willingly give the deed asked, if you wish it after knowing the circumstances. The records will show that the Independence mine was located by an old man by the name of Munn, and a son, and a Mr. Brown and some one else. When the excitement was running high in 1879, and the Independence was overlaid with the Uncle Sam, Little Johnny, Gen'l Shields and others, the owners deeded to me, if I would fight the matter through. I gave them an obligation to pay them quite a large amount when the mine was sold or disposed of by me. If you will accept the deed under these conditions, and release me from your judgment and costs, I will deed to you. My interest in the Independence is five-eighths. Reed can tell you the relation the Independence holds to the combination. The Little Link is subject to costs of patent. You know the condition of things, and can elect what you will do, or I will raise the money, and pay one-half of the judgment and costs, $165.21, if I can be released from the judgment, and you hold Cunningham for the other half."

This was a distinct statement by Henshall that the claim was deeded to him in consideration of his fighting through the contest of title, and the obligation in case of success "to pay them quite a large amount when the mine was sold or disposed of by me [him]." He had already placed the mine in the Archer Consolidation Syndiate, in pursuance of which trust agreement Reed afterwards conveyed absolutely to the Ibex Mining Company, whereby Henshall's "obligation to pay them [the complainants] quite a large amount" became absolute, if the title or interest had not then passed under the sheriff's deed.

In the second amended bill the complainants, to affect the subsequent purchasers with notice of the existence of the trust agreement with Henshall, seek to attach or connect themselves with the trust instrument executed between said James S. Brown, Jr., and Henshall as to Brown's undivided one-fourth interest in said mine, which instrument was duly put to record. As this agreement between Henshall and Brown was not executed for more than three months subsequent to the date of Cartwright's deed to Henshall and the making of the alleged agreement between them, the very reverse of what is claimed by counsel would seem to be the effect, to wit, that as Brown's contract was put to record, and no such contract between the complainants and Henshall was of record, the clear implication would arise in favor of subsequent takers under Henshall that no like agreement was made by Henshall with complainants. By the terms of the Archer consolidation agreement, the interest of Henshall, as the apparent owner of the property, was placed in Reed, as trustee, for the purpose of consolidating the conflicting claims to all the properties named, with power to dispose of upon the condition of the future determination and request of two-thirds of the beneficiaries in interest, they being designated as "the owners," and until executed Reed had only a power to dispose of or sell as trustee. There was unquestionably, therefore, an equitable interest in Henshall as the beneficial owner pro tanto.

A majority of the court are of opinion that under the authority of Brandies v. Cochrane, 112 U. S. 344, 5 Sup. Ct. 194, 28 L. Ed. 760, the Archer agreement constituted an active trust as distinguished from a technical trust power. This, however, does not dispose of

the question as to whether, under the Colorado statute, that interest was subject to seizure and sale under execution for Henshall's debts. The ruling in the case of Brandies v. Cochrane, supra, that a judgment against the grantor under a trust agreement, with power of appointment, such as existed in that case, did not create a lien on the equitable estate so as to bind a subsequent purchaser with notice, was predicated of the statute of the state of Illinois, which did not change the common-law rule in the particular case. The Illinois statute in question, which provided that judgments should be a lien on the real estate of the judgment debtor, declared that:

"The term 'real estate' in this section shall be construed to include all interest of the defendant, or any person to his use, held or claimed by virtue of any deed, bond, covenant, or otherwise, for a conveyance or as mortgagee or mortgagor of lands in fee, for life or for years."

As under the decision of the Supreme Court of Illinois, where the legal title to lands is in a trustee to subserve the purposes of an active trust, the judgment creditor acquired no lien at law, but could only secure one by a bill in equity, according to the chancery practice act, prescribed by the statute of that state, it controlled the law of the particular case.

It will be observed that the court adverted to the ruling in White v. McPheeters, 75 Mo. 286, that:

"That case arose under the Missouri statute, which appears to be broader than that of Illinois in its definition of real estate subject to seizure and sale on executions at law, and, was, in fact, a proceeding in equity by a creditors' bill to subject the estate, which was subject to the power of appointment, and had been conveyed to a volunteer in pursuance thereof, to the satisfaction of judgments."

The Colorado statute (Mills' Ann. St. § 2529), in force at the time of the rendition of the Jeffery judgment, goes far beyond the provisions of the Illinois statute. It declares that:

"All and singular the goods and chattels, lands, tenements and real estate of every person against whom any judgment shall be obtained in any court of record * * * for any debt, damages, costs or other sum of money, shall be liable to be sold on execution, * * * and the said judgment shall be a lien on such lands, tenements and real estate, from the last day of the term of the court in which the same may be rendered, for the period of seven years. * * * The term real estate in this section shall be construed to include all interest of the defendant or any person to his use, held or claimed by virtue of any deed, bond, covenant, or otherwise, for a conveyance or as mortgagor of lands, in fee, for life or for years."

Section 2582 of said statute is as follows:

"Legal and Equitable Interests in Land Subject to Execution.—Every interest in land, legal and equitable, shall be subject to levy and sale under execution, and the claim or possessory right of any defendant in execution, in or to any public lands, may be levied upon and sold under execution, in the same manner as if the same were held by such defendant in fee simple; Provided, that nothing in this chapter contained shall be so construed as to give any plaintiff in execution the right to levy on any land filed on by any person, in the land office of the Colorado Land District, and occupied as a homestead by the defendant in execution."

It has been expressly held by the Supreme Court of Colorado that while such equitable interest in real estate may be properly reached

by a bill in equity to subject it to the payment of the debts of the cestui que trust, it may likewise, under the broad terms of the statute, be seized and sold on execution. In McFarren v. Knox et al., 5 Colo. 217, 221, the court, speaking of judgment liens, referred to the statute of the state defining what property might be sold under execution, and held that it constituted a lien upon whatever real estate might be levied upon:

"In this view the judgment of McFarren, upon being filed in the office of the recorder, became a lien upon McGovney's interest in the land in dispute as assignee of the bond from Rose, which was an equitable interest, unless such interest passed by virtue of the prior assignment."

The court further said:

"The assignment by the obligee or his assignee of a bond for the conveyance of real estate comes clearly within the provisions of this section, and unless recorded will not take effect as against a subsequent bona fide purchaser or incumbrancer without notice."

In Barnes v. Beighly, 9 Colo. 479, 12 Pac. 908, the court said:

"Under our statutes all equitable interests in property are subject to levy and sale on execution. For the purpose of acquiring a lien on any real estate owned by a judgment debtor, or which he may acquire after judgment, situate in a different county from that in which the judgment is entered, it is provided by section 1839 that the creditor may file a transcript of his judgment with the recorder of such county."

In O'Connell v. Taney, 16 Colo. 356, 27 Pac. 888, 25 Am. St. Rep. 275, the court, speaking of the provisions of the general statutes of the state, said:

"Every interest on land, whether legal or equitable, is made subject to levy and sale under execution. Under this provision, appellee might have caused the execution issued upon the judgment * * * to have been levied upon the latter's interest in the very property here in controversy, and had the same sold in satisfaction thereof. Had this course been pursued, the purchaser thereafter could have maintained an action for the purpose of having his interest in the premises determined."

In that case the judgment creditor resorted to a creditors' bill, and the court only said that:

"The judgment creditor was not, however, compelled to resort to this mode of procedure [by execution sale]. The action which he did institute might be pursued with at least equal propriety."

This same doctrine is again recognized in Mulock v. Wilson, 19 Colo. 301, 35 Pac. 534, where it is said:

"That a person having procured a sheriff's deed to land, based upon valid proceedings, may maintain an action to set aside and cancel a deed given by the judgment debtor before the recovery of the judgment, with intent to defraud the judgment creditor. * * * A judgment creditor desiring to set aside a supposed fraudulent deed of real estate may bring his action therefor to test the validity of the deed before attempting to subject the premises to execution sale; or the purchaser, after such sale, may bring his action to remove the cloud from the title by canceling the supposed fraudulent deed, and to recover possession of the premises."

In La Fitte et al. v. Rups, 13 Colo. 208 (22 Pac. 309), the syllabus is:

"Where one purchases and pays for real property, causing title to be conveyed to another without consideration, a trust results in favor of the former, by means of which the property may be subjected to execution."

So in Stock Growers' Bank v. Newton, 13 Colo. 246, 249, 22 Pac. 444, 445, the court said:

"A judgment creditor, desiring to set aside a supposed fraudulent deed of real estate, may bring his action therefor to test the validity of the deed before attempting to subject the premises to execution sale; or the purchaser, after such sale, may bring his action to remove the cloud from the title, etc. [Citing authorities.] It is scarcely necessary to add that by section 1883, Gen. St., every interest in land, legal and equitable, is subject to levy and sale under execution in this state."

Freeman in his work on Executions, vol. 2 (3d Ed.) p. 953, adverting to statutes broader than the statute of 29 Charles II, said:

"In California, Colorado, Connecticut, Indiana, Iowa, Kansas, Maryland, Minnesota, Montana, New Hampshire, Nevada, Pennsylvania, Utah, and Washington, equitable estates are subject to execution much more extensively than under the statute of 29 Charles II. In fact, in most of these states all beneficial estates are liable to be taken in execution, irrespective of the question of whether they are legal or equitable."

The case of Fallon v. Worthington, 13 Colo. 559, 22 Pac. 960, 6 L. R. A. 708, 16 Am. St. Rep. 231, cited by complainants' counsel to support the contention that such an equitable interest in land at bar cannot be sold under execution, is not in point. An examination of that case discloses that, although Fallon had an interest in the property at one time, and at one time held a trust deed thereon, that interest had been disposed of and the trust deed released; so when execution was levied upon the supposed interest of Fallon, he had neither a legal nor equitable interest therein, but simply a personal contract between himself and the grantee. Therefore, the court said:

"The entire legal title was in Worthington. He was in possession of the property. Fallon reserved no interest or estate in the land whatsoever."

As the foregoing construction placed upon the local statute of Colorado by the Supreme Court of the state becomes a rule of property as affecting real estate situate therein, it is absolutely binding on the federal court.

In Hervey v. R. I. Locomotive Works, 93 U. S. 664, 671, 23 L. Ed. 1003, it was said:

"It was decided by this court in Green v. Van Buskirk, 5 Wall. (U. S.) 307, 18 L. Ed. 599; Id., 7 Wall. (U. S.) 139, 19 L. Ed. 109, that the liability of property to be sold under legal process issuing from the courts of the state where it is situated must be determined by the law there, rather than of the jurisdiction where the owner lives. These decisions rest on the ground that every state has the right to regulate the transfer of property within its limits."

So in Warburton v. White, 176 U. S. 496, 20 Sup. Ct. 409, 44 L. Ed. 555, it is said:

"Where state decisions have interpreted state laws governing real property, or controlling relations which are essentially of a domestic and state nature —in other words, where the state decisions establish a rule of property—this

court, when called upon to interpret the state law, will, if it is possible to do so, in the discharge of its duty, adopt and follow the settled rule of construction affixed by the state court of last resort to the statutes of the state, and thus conform to the rule of property within the state. It is undoubted that this rule obtains, even although the decisions of the state court, from which the rule of property arises, may have been for the first time announced subsequent to the period when a particular contract was entered into."

In Christy v. Pridgeon, 4 Wall. (U. S.) 203, 18 L. Ed. 322, Mr. Justice Field says:

"The interpretation within the jurisdiction of one state becomes a part of the law of that state, as much so as if incorporated into the body of it by the Legislature."

In an early case (McKeen v. Delancy, 5 Cranch [U. S.] 32, 3 L. Ed. 25) Chief Justice Marshall said:

"In construing the statutes of a state on which land titles depend, infinite mischief would ensue should this court observe a different rule from that which has been long established in the state."

An examination of the cases cited by counsel for complainants will show that they either present distinguishing facts, or depend upon rules of decision where the statute of Colorado has supplied the very provisions wanting in the state, the absence of which left the court free to follow its own notion. Mrs. Jeffery, as the purchaser under the sheriff's deed of the equitable interest represented by Henshall in the Archer consolidation agreement, sustained the same relation to that interest occupied by Henshall at the time of the sale, and was invested with all the rights and remedies at law or in equity for the protection and enforcement of that interest secured by Henshall as a party to the trust arrangement.

Contention is made by complainants' counsel, in the attempt to liken the Colorado statute to that of 29 Charles II, subjecting lands, tenements, etc., to sale, that "trusts which come within the operation of the statute are only such pure and simple trusts as exist when the cestui que trust has the whole beneficial interest, and the trustee the naked legal title, and that any complicated trust, or where other persons are interested besides the judgment debtor, are not within the statute, and can only be reached through a court of chancery." There are several answers to this: (1) The Colorado statute is broader than the English statute in subjecting any equitable interest in lands of the debtor to execution. (2) Under the trust agreement, each of the cestuis que trust owned an entire beneficial interest, in the ratio or proportion expressly designated and declared by the trust agreement, without any present, remote, or contingent interest in any one else, with no provision that any other interest under any contingency may be grafted thereon during the continuance prior to sale thereunder by appointment, as provided.

Underhill on Trusts & Trustees (Amer. Ed.) art. 58, title "Power of One of Several Beneficiaries Partially Interested in a Special Trust," says:

"(1) The authority of one of several beneficiaries in a special trust in general depends upon the terms of the trust as construed by the court; but if sui juris, a beneficiary cannot be restrained from assigning his or her interest,

save only in the case of a married woman, who may, by apt words, in the settlement, be restrained from doing so during her coverture, but not before or afterwards.

"(2) An equitable tenant for life of land, within the meaning of the settled land act, 1882, has all the powers of selling, enfranchising, partitioning, leasing, mortgaging, etc., conferred on tenants for life by that act. And such person may prevent the trustees exercising their powers of the like character without his consent." See 2 Beach on Trusts & Trustees, § 712.

In Sparhawk v. Cloon, 125 Mass. 263, Chief Justice Gray said:

"At law, any property, real or personal, that a man owns, may be alienated by him, or may, unless specially exempted by statute, be taken for the payment of his debts; and no form of grant or device can enable the grantee or devisee to hold the estate without its being subject to alienation, attachment, and execution. From the time of Lord Eldon, the same rule has prevailed in the English Court of Chancery to the extent of holding that where the income of a trust estate is given to any person (other than a married woman) for life, the equitable estate for life is alienable by, and liable in equity to the debts of, the cestui que trust, and that this quality is so inseparable from the estate that no provision, however express, which does not operate as a cesser or limitation of the estate itself, can protect it from his debts. The English doctrine has been approved in many decisions and dicta in this country. On the other hand, it has been maintained by judges whose opinions are entitled to the highest respect that the founder of a trust may secure the enjoyment of it to other persons, the objects of his bounty, by providing that it shall not be alienable by them or be subject to be taken by their creditors; and that his intentions in this regard, when clearly expressed by him, must be carried out by the court."

Obviously enough, the foregoing enunciation in no wise conflicts with the doctrine that the creator of a trust may so construct it in favor of the object of his bounty as to render it inalienable by him, or to place it beyond the reach of execution for his debts. There is in the Archer consolidation agreement no prohibition upon alienation by the cestuis que trust, expressed or implied, and consequently no exemption from levy and sale under execution under the Colorado statute, and there is no limitation of the use to which the income therefrom may be applied. See Farmers' & Merchants' Savings Bank v. Brewer, 27 Conn. 599, and note to article 58 of Underhill on Trusts and Trustees, American Edition.

No power of disposition was vested by the trust agreement in Reed, except upon the authorization by two-thirds in interest of the cestuis que trust. Even without this reservation of power in the beneficiaries, in the absence of express authority conferred on the trustee to alien or apply the income or proceeds to a third designated beneficiary, it remained in the cestuis que trust. The whole scope and purpose of the Archer consolidation agreement was to create a trustee to do certain things, for the exclusive benefit of the named beneficiaries as owners, under a conventional plan of organization among the conflicting claimants to the properties concerned, to do that which by concert of action they might have done themselves without the designation of the agent Reed. In the event of nonaction or nonconcurrence by the two-thirds in interest, the respective interests of the beneficiaries remained until such action, subject to the liabilities of the interest of each to respond to the obligations imposed under the Colorado statute to answer for his debts.

The validity of the sheriff's deed to Mrs. Jeffery is assailed on the ground that the description of the property levied on is bad for incompleteness or uncertainty. The levy was made upon:

"All the right, title, and interest of James Henshall and P. J. Cunningham in and to the following described property, to wit: * * * The Independence lode, the Archer lode, the San José lode, the Little Stella lode, the General Shields lode, the Burlington lode, the Winnemuck No. 2 lode, and the Uncle Sam lode (these were the properties constituting the conflicting claims), situate on Breece Hill, in California Mining District, Lake county, Colorado, and now standing in the name of Clinton Reed or C. Reed, trustee, on the records of said Lake county, known as and called the 'Archer Consolidation.'"

The criticism made, in its substantive effect, is that the description did not more specifically state what the interest of Henshall was by saying it was an undivided one-half interest in the Independence mine. As already shown, the statute of the state subjected to execution every interest in lands, legal and equitable, and the claim or possessory right of any defendant in execution, in or to any public lands, in the same manner as if the same were held by such defendant in fee simple. Section 2582, Mills' Ann. St. Colo. It is the generally recognized rule of law respecting levies and sheriffs' deeds that a description is good and sufficient which, taken as a guide, will point the way to the land, and readily enable the inquirer to identify it, and for this purpose even parol evidence may be resorted to. "There may not be a certainty to every intent, nor is it necessary that there should be in such a case; certainty to a general intent, such as would put the owners and purchasers upon inquiry, affording the means of complete information, is all that can be expected." By the decided weight of authority this description was sufficient. Blair v. Burns, 8 Colo. 397, 8 Pac. 569; Stevens v. Wait, 112 Ill. 544; Small v. Jenkins, 82 Mass. 155; Travelers' Insurance Company v. Yount, 98 Ind. 454; Frey v. Clifford, 44 Cal. 335; Shewalter v. Pierner, 55 Mo. 216; Field v. Huston, 21 Me. 69; Freeman on Executions (3d Ed.) § 381; Devlin on Deeds, § 1435; Murfree on Sheriffs, §§ 1697, 697; Brown v. Smith, 7 B. Mon. (Ky.) 261; Smith v. Crosby, 86 Tex. 15, 23 S. W. 10, 40 Am. St. Rep. 818; Inman v. Kutz, 10 Watts (Pa.) 90; Laughlin v. Hawley, 9 Colo. 170, 11 Pac. 45.

The Independence mine had a local habitation and a name, well known in that mining region. The very situs of it was given in the levy and deed—"situate on Breece Hill in the California Mining District, Lake county, Colorado." More than that, it recited, "now standing in the name of Clinton Reed or C. Reed, trustee, on the records of said Lake county, known as and called the 'Archer Consolidation'" —an instrument that declared what Henshall's interest was.

It was competent for Frank R. Jeffery, in bidding off the property at execution sale, to transfer his purchase to his wife, who thereby became the recipient of the sheriff's deed and invested with the title. Gwynne on Sheriffs, 376; Jamison v. Tudor, 3 B. Mon. (Ky.) 357; Frizzle v. Veach, 1 Dana (Ky.) 212; Massey v. Young, 73 Mo. 260. Mrs. Jeffery, however, would acquire thereby no better right or title than Frank R. Jeffery had the deed been made to him. Baird v. Given, 170 Mo. 302, 70 S. W. 697. The title of Mrs. Jeffery having passed

by deed to J. C. Brown and from him to the Ibex Mining Company, and there being no infirmity apparent of record, the title of the complainants thereby passed and vested in said company, unless invalidated by something dehors the record.   On the other hand, if there was any fatal infirmity in this chain of title, the legal title of complainants passed under the deed from Henshall to Clinton Reed, and from Reed under the Archer consolidation agreement vested in the Ibex Mining Company.   To meet this situation the complainants contend that the company took with notice of the alleged trust agreement between them and Henshall.

Conceding, for the purposes of this contention, the existence of the trust in favor of complainants, what proof does this record furnish of notice of its existence or its terms to the subsequent purchasers?   In respect of the title acquired under the Jeffery and Dale execution sale and sheriff's deed, contention is made that the letter written by James Henshall to Jeffery and Dale, of date February 1, 1890, imparted notice of an equitable interest in the complainants.   Even if it were conceded that this letter suggested the existence of such a trust agreement between Henshall and the complainants as pleaded, the information was conveyed, not only after the judgment was rendered, which constituted a lien upon the Henshall interest in the property, but it was after the sale under the execution and the payment of the purchase money.   Under the Colorado statute (section 446, Mills' Ann. St.) it is provided as follows:

"Notice Takes Effect From Filing Record, Except as to Parties Having Notice.—All deeds, conveyances, agreements in writing of, or affecting title to real estate or any interest therein, may be recorded in the office of the recorder of the county wherein such real estate is situate, and from and after the filing thereof for record in such office, and not before, such deeds, bonds and agreements in writing shall take effect as to subsequent bona fide purchasers and incumbrancers by mortgage, judgments or otherwise not having notice thereof."

In McFarren v. Knox, 5 Colo. 217, it was expressly held that, in respect of an assignment not recorded, the subsequent judgment lienor and purchaser without notice obtains the better title.

In Gates Iron Works v. Cohen, 7 Colo. App. 341, 348, 43 Pac. 669, the court said:

"By the terms of our statute concerning conveyances, instruments in writing affecting title to real estate do not take effect as to subsequent bona fide purchasers, or incumbrancers by mortgage, judgment, or otherwise, not having notice thereof, until they are filed for record in the office of the recorder of the county in which the real estate is situate.   General Statutes, § 215.   By these statutory provisions the lien of an attachment would take precedence of an outstanding interest in the land, where such interest is evidenced by an unrecorded deed or contract of which the attachment or judgment creditor had no notice.   The statute changes the rule which, prior to its passage, was of universal application, so as to place attachment and judgment creditors upon the same footing with purchasers in respect of land, a legal or equitable interest in which has been conveyed, but the deed not recorded." See, also, Wahrenberger v. Waid, 8 Colo. App. 200, 45 Pac. 518.

Although the sheriff's deed was not delivered until the 1st of December, 1890, after the expiration of the period for redemption, when delivered it had relation back to the lien of the judgment.   If, therefore,

it had been shown that J. C. Brown, the grantee of Jeffery, had notice of the alleged trust in favor of the complainants when he bought, it would not affect his title, as it is well-settled law that a purchaser with notice may protect his title by purchasing that of a bona fide purchaser without notice. Funkhouser v. Lay, 78 Mo. 459, 465. This for the reason, stated by Chancellor Kent in Bumpus v. Platner, 1 Johns. Ch. (N. Y.) 220, "to prevent a stagnation of property, and because the first purchaser, being entitled to hold and enjoy, must be equally entitled to sell." The question of notice, therefore, as it pertains to the title acquired under the Jeffery and Dale judgment, is thus effectually disposed of, and may be regarded as out of the controversy.

Counsel for complainants in this connection, however, both in oral argument and brief, criticise with much severity the transaction by which J. C. Brown obtained the deed of conveyance from Jeffery and wife; that Jeffery being in great financial straits, and his wife's ill health demanding change of locality, it is urged that Brown took advantage of Jeffery's distress to obtain his property at an unconscionable sacrifice, and that the Ibex Mining Company, in whose interests Brown was acting, had in its possession at the time funds due to Henshall's interest more than the purchase price. Without entering into detail, it is sufficient to say that the evidence shows that for a year or more preceding the consummation of this transaction Jeffery had been endeavoring to dispose of his interest in this property and a claim in connection with the Idlewild claim, connected with the Little Johnny group, respecting which there was some pending litigation. Brown was more particularly concerned in obtaining from Jeffery the Little Johnny interest. The importunities for sale came from Jeffery rather than from Brown. The evidence is that the consideration of $6,000, expressed in the deed, was paid by Brown, as acknowledged in the deed. The share of the accrued royalties in the hands of Reed and the Ibex Mining Company, amounting to $166, was paid to Mrs. Jeffery afterwards. We are unable to find any just basis for the contention that these royalties in fact amounted to $1,200. The matter of the claim of $2,000 was no part, in fact, of the purchase price of said interest. It pertained to a disputed claim then in litigation, growing out of an option to purchase and mine, and to apply the proceeds on the purchase price in a collateral matter. Neither do we find any deceit practiced or misrepresentation made by Brown to mislead or overreach Jeffery in the transaction. Jeffery was not prevented from disclosing to Brown the facts of his situation or his reason for desiring to sell. The two parties to the deal were sui juris, and dealt with each other at arm's length. We know of no authority or reason for holding that what Jeffery consented to take disentitles Brown to the position of a bona fide purchaser for value. If it were conceded that Jeffery was entitled to a claim for royalties growing out of the Little Johnny or other properties, greater than the consideration paid him by Brown, he knew the fact better than any one else. If, without duress or fraud practiced upon him, he consented to take less than the actual value, how the complainants in this controversy, to which Jeffery is not a party, can avail themselves of any injustice done him, challenges comprehension. With full knowledge

148 F.—48

of what he was selling and what he was getting therefor, he parted with his title, and from that day to this he has never challenged by action the validity of the transfer, nor invited the Munns or their counsel to take up the wage of battle for them, or put them in legal position to undo what he voluntarily did.

There is a broad distinction between a valuable and an adequate consideration, as applied to this situation. The consideration paid for a conveyance may be so inadequate, coupled with other attendant circumstances, as to afford sufficient ground for the party wronged to ask a court of equity to relieve him. The consideration paid may also be so greatly disproportioned to the actual value of the property as to appeal to the discretion of the chancellor, in saying that such a purchaser did not buy in good faith. But it is well-recognized law that the consideration, while it must be valuable, need not be commensurate with the actual value of the property. The evidence in this record presents no such state of facts as to warrant the court in saying that Brown or the Ibex Mining Company was not a bona fide purchaser for value.

Neither is there foundation for the suggestion made that the whole consideration for this conveyance to Brown was not paid at the time suit was brought. The consideration for the Archer consolidation and the Idlewild interest was paid on the 13th day of May, 1903. The deferred payment pertained solely to the interest in the Little Johnny claim owned by another person not connected with the title to the premises in dispute.

Turning to the title derived through Clinton Reed under the Archer consolidation agreement, what is there in this record to warrant a decree in favor of the complainants predicated of notice to the Ibex Mining Company of the existence of the alleged trust relation between Henshall and the complainants? There is some shadowy evidence of one Geo. Trimble, who afterwards became a stockholder and director in the Ibex Mining Company, having received information as far back at 1878 of complainants being interested as locators of the Independence lode. But what of it? The record afterward showed that under a power of attorney given by the complainants to Cartwright the latter conveyed the absolute title to Henshall. There was no record evidence of any trust agreement between the grantor and the grantee conditioning the transfer of the title. The Ibex Mining Company did not come into existence until about 12 years thereafter. The letter from Munn to Trimble, of date April 11, 1894, was nearly a year after the Ibex Mining Company had obtained the title of Jeffery, and of Reed under the Archer consolidation agreement; and, even if it were conceded (which we do not find sufficient evidence to support) that J. C. Brown obtained some information sufficient to excite inquiry during his dealings with Jeffery, as already shown, he was an innocent purchaser under the Jeffery judgment and execution sale.

In much of the contention of learned counsel for complainants respecting incidents invoked as a basis of notice to the Ibex Mining Company they seem to misconceive the correct rule of law applicable to the case. There has rarely been a more exact statement of the rule of notice in question than that expressed by Judge Vories in Hayward v.

National Insurance Company, 52 Mo. 191, 192, 14 Am. Rep. 400, where he said :·

"The meaning must be that the notice must be given to the agent wihle his agency exists, and it must refer to business which comes within the scope of his authority. When this is the case, I think that notice to the agent is notice to the principal; in fact there is no other way to notify a corporation than to notify an agent. A corporation only acts through and by agents, and the proper and only way to give notice to a corporation is to notify an agent; and generally it is sufficient to notify an agent, whose proper business is to attend to the matter in reference to which the notice is given."

He then quoted from Story's Agency, paragraph 140, as follows :

"Upon a similar ground, notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject-matter of his agency; for upon general principles of public policy it is presumed that the agent has communicated such facts to the principal, and if he has not, still the principal, having intrusted the agent with the particular business, the other party has a right to deem his acts and knowledge obligatory on the principal; otherwise the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights and interests of such party. But unless notice of the facts come to the agent while he is concerned for the principal, and in the course of the very transaction, or so near before it that the agent must be presumed to recollect it, it is not notice thereof to the principal; for otherwise the agent might have forgotten it, and then the principal would be affected by his want of memory at the time of undertaking the agency. Notice, therefore, to the agent before the agency is begun or after it has terminated will not ordinarily affect the principal." See, also, Mechem on Agency, §§ 718, 719.

As notice to the principal is predicated of the fact of notice to the agent while engaged on the business of his agency, because of the obligation imposed, in fidelity to his principal, to impart the information to him, it must follow that when the condition on which the notice to the principal is presumed does not exist, notice to the principal cannot be assumed. See, also, Thompson on Corporations, vol. 4, §§ 5189, 5190, 5191, 5192, 5204; Phœnix Insurance Company v. Fleming, 65 Ark. 63, 44 S. W. 464, 39 L. R. A. 789, 67 Am. St. Rep. 900; Armstrong v. Abbott, 11 Colo. 223, 17 Pac. 517; Yerger v. Barz, 56 Iowa, 82, 8 N. W. 769.

In a general and indiscriminate criticism of the testimony of Charles Cavender, counsel for the complainants seek to create the impression that he must have discovered something touching the complainants' interest which should be imputed to the Ibex Mining Company. Cavender was the attorney who examined for the company the Jeffery title to this property. So far from the evidence warranting the remotest inference that he acquired any information of any trust agreement between the complainants and Henshall, his testimony is full and explicit that he made a thorough examination, and finding that the records showed title in Henshall, and being of opinion that the deed from the sheriff effectually vested that title in Mrs. Jeffery, and having no notice of the complainants' claim, he reported the title good. The law did not exact of him that without any admonition to excite such inquiry he should have inquired of Henshall if there might not be some unrecorded, undisclosed compact conditioning his record title. So far from Henshall imparting to the Ibex Mining Company, or any one representing it, information respecting complainants' interest, in his letter of

April 29, 1902, to one Darby, who was interested in the Archer consolidation trust, and was soliciting consent of the beneficiaries therein to an extension of the lease, he said:

"Your note received. I suppose I have lost my interest in the Independence. Judgment was obtained against me on a debt contracted by Pat Cunningham years ago, and the property was sold; so I suppose I am out, and if you find I am in it, I will gladly sign."

The Pat Cunningham debt referred to Henshall claimed he was only surety for, on which the said judgment was obtained against him.

Some other incidents have been discussed by counsel touching the question of notice, but they are so intangible and inconsequential as not to deserve consideration. As said in Scott v. Gallagher, 14 Serg. & R. 332, 16 Am. Dec. 508:

"Courts of justice view secret agreements with a jealous and scrutinizing eye. The owner of the legal title should have direct, express, and positive notice; otherwise he takes the property discharged of the trust which existed between the original parties. There would be no hardship in the case on Gallagher, because it was his own folly to place himself and others in the power of McCormick. If any person suffers it should be Gallagher, and not Scott, for this plain and obvious reason, that he has been the cause of the loss sustained. Equity says, if one of two innocent persons must suffer, he who has been the cause shall bear the loss."

This rule has recently been affirmed in United States v. Detroit Lumber Company, 200 U. S. 321, 332, 333, 26 Sup. Ct. 285, 50 L. Ed. 499, in which Mr. Justice Brewer, speaking for the court, said:

"No one is bound to assume that the party with whom he deals is a wrongdoer, and if he presents property, the title to which is apparently valid, and there are no circumstances disclosed which cast suspicion upon the title, he may rightfully deal with him, and, paying full value for the same, acquire the rights of a purchaser in good faith. Jones v. Simpson, 116 U. S. 609, 615, 6 Sup. Ct. 538, 29 L. Ed. 742. He is not bound to make a searching examination of all the account books of the vendor, nor to hunt for something to cast a suspicion upon the integrity of the title. * * * The rule in respect to constructive notice was thus stated in Wilson v. Wall, 6 Wall. 83, 90, 91, 18 L. Ed. 727: 'A chancellor will not be astute to charge a constructive trust upon one who has acted honestly and paid a full and fair consideration without notice or knowledge. On this point we need only to refer to Sugden on Vendors, p. 622, where he says: "In Ware v. Lord Egmont the Lord Chancellor Cranworth expressed his entire concurrence in what, on many occasions of late years, had fallen from judges of great eminence on the subject of constructive notice, namely, that it was highly inexpedient for courts of equity to extend the doctrine. When a person has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as to enable the court to say, not only that he might have acquired, but also that he ought to have acquired, it but for his gross negligence in the conduct of the business in question. The question, then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining, and might by prudent caution have obtained, the knowledge in question, but whether not obtaining was an act of gross or culpable negligence."' And again in Townsend v. Little, 109 U. S. 504, 511, 3 Sup. Ct. 357, 361, 27 L. Ed. 1012: 'Constructive notice is defined to be in its nature no more than evidence of notice, the presumption of which is so violent that the court will not even allow of its being controverted. Plumb v. Fluitt, 2 Anst. 432; Kennedy v. Green, 3 My. & K. 699. * * * As said by Strong, J., in Meehan v. Williams, 48 Pa. 238, what makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell. See,

also, Holmes v. Stout, 3 Green Ch. 492; McMechan v. Griffing, 3 Pick. 149, 15 Am. Dec. 198; Hanrick v. Thompson, 9 Ala. 409.' "

See, also, discussion of this question by Sanborn, J., in same case (United States v. Detroit Timber & Lumber Co., 131 Fed. 668, 67 C. C. A. 1).

It is next insisted that, as the fee to the Independence mine remained in the United States until patent issued, the purchaser under Henshall acquired only an equitable interest no greater than that of the complainants. Mining claims are by the Colorado statute (Mills' Ann. St. § 456) declared to be real estate. This character of property possesses the quality of any other possessory title to land. It passes by inheritance, sale, mortgage, or execution sale. "Where there is a valid location of a mining claim, the area becomes segregated from the public domain and the property of the locator." St. Louis Mining Co. v. Montana Mining Co., 171 U. S. 655, 19 Sup. Ct. 61, 43 L. Ed. 320. So long as the locator or his assignee performs the required amount of work, his right of possession is exclusive against every person and against the United States. He may never obtain the patent, but when it does issue, it has relation back to the location. For the purpose of attack and defense he is the owner, and when this title passes from him to an assignee or grantee, it is protected in the hands of such assignee or grantee by the registration statutes of the state against an equitable claim thereto or interest therein not of record and unknown at the time of the transfer. Revised Statutes of the United States, § 910 [U. S. Comp. St. 1901, p. 679]; Roseville Co. v. Iowa Gulch Co., 15 Colo. 29, 24 Pac. 920, 22 Am. St. Rep. 373; McFeters v. Pierson, 15 Colo. 201, 24 Pac. 1076, 22 Am. St. Rep. 388; Forbes v. Gracey, 94 U. S. 767, 24 L. Ed. 313; Belk v. Meagher, 104 U. S. 283, 26 L. Ed. 735; Manuel v. Wulff, 152 U. S. 511, 14 Sup. Ct. 651, 38 L. Ed. 532; Butte Co. v. Frank (Mont.) 65 Pac. 1; Bakersfield Co. v. Kern County (Cal.) 77 Pac. 892.

Incidental and parallel to the latter contention, the further proposition is advanced that, as the fee to this property remained in the United States until patent issued, the position of the complainants, as equitable owners, being prior in time to that of the purchasers under the locator, theirs is the superior equity. This question is so effectually settled against the contention of the complainants by the ruling of this court in United States v. Detroit Timber & Lumber Company, 131 Fed. 668, 67 C. C. A. 1, affirmed by the Supreme Court in 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, as to render further discussion a work of supererogation.

With apparent assurance of confidence, learned counsel for the complainants advance the ultimate proposition that the only right the Ibex Mining Company could possibly assert as against Henshall would be to offset what it paid for said interest against what was coming to him under the terms of the Archer consolidation, with the right in Henshall to exact, within a reasonable time, a conveyance to him of his interest in the mine before refunding the purchase price paid by the company as the tenant in possession; such reasonable time being commensurate with the duration of the lease and such time thereafter as might be

deemed·consonant·with equity under the circumstances of the particular, case. It might be sufficient ·to say, in answer to· this pronouncement., that in all the years which have accumulated since such right, if a right might have been asserted, the complainants have not exhibited faith enough in it to actively invoke it. The underlying theory of this contention, we take it, is that at the time it is claimed Brown acquired the Henshall title under the Jeffery and Dale judgment and Mrs. Jeffery, he was acting for the Ibex Mining Company, which was at the time a tenant under lease from Reed, trustee; therefore, the purchaser falls under the ban of the law which prohibits a lessee from buying in an out- standing title so as to oust the landlord, and hence' the claim to the right of redemption. This contention is as disregardful of the facts in this record as the law applicable to the situation. In the first place, Henshall's legal title had passed out of him by operation of law under the execution sale, as he afterwards recognized in his letter to Jeffery, and by his voluntary act in conveying to Reed under the consolidation agreement, which, as the record title stood, the purchaser had the right to assume he was fully empowered to do.

Even, however, if the relation of landlord and tenant existed between Henshall and the Ibex Mining Company when the title under Jeffery was acquired, the fact did not conclude the company from adversing the landlord's title by acquiring it under a proceeding in invitum against the landlord. We understand the law to be that the tenant may buy in the landlord's title under judgment and execution sale. In such case he may plead against the landlord that, although he had an interest in the premises at the time of the creation of the relation of landlord and tenant, it terminated by act of the law, or under voluntary grant of the fee by the landlord. Taylor's Landlord & Tenant (9th Ed.) §§ 639, 705, 708; Hardin v. Forsythe, 99·Ill. 312; Elliott v. Smith, 23 Pa. 131– 137; Camley v. Standfield, 10 Tex. 546, 60 Am. Dec.·219; Lamson v. Clarkson, 113 Mass. 348, 18 Am. Rep. 498. "It is always competent for a tenant to set up that the title of his landlord has come to an end subsequent to the date of the lease, and that whenever the enjoyment ceases by lawful title, rent, which is the recompense of enjoyment, also ceases." Duff v. Wilson, 69 Pa. 316; Shields v. Lozear, 34 N. J. Law, 496, 3 Am. St. Rep. 256; Presstman v. Silljacks, 52 Md. 647; Jenkinson v. Winans, 109 Mich. 524, 67 N. W. 549.

Judge Cowen, in Nellis v. Lathrop, 22 Wend. (N. Y.) 121, 34 Am. Dec. 285, said:

"So long as he [the tenant] is not expelled, he ,has, in ·general, no right to question his landlord's title. He cannot deny that he had· a right to demise at the time of the lease. He cannot defend, on the ground that he has acquired an outstanding title adverse to that of the landlord. But I am not aware that the estoppel goes further. If the landlord part with his title pending the lease, the duty of the tenant, including that of paying rent, is due to the assignee; and should the· tenant buy in the assignee's right, the· lease would be extin- guished. So, should the landlord sell and release to the lessee. * * * There- fore, had there been a sheriff's sale of the whole reversion in the demised premises, and the tenant had redeemed or purchased under the judgment, no action could have been sustained; for a purchase or acquisition of title under a judgment against the lessor is the same thing as if he had granted by· deed. It· is, to be sure, acquiring title indirectly and by operation of law from the lessor, but it comes through his act and consent, or his neglect, and

is, therefore, the same in legal effect as if he had granted or devised a reversion."

In 17 Amer. & Eng. Encyc. of Law (2d Ed.) p. 676, it is said:

"The general rule applies to the purchase by one tenant of the property at a judicial sale, and such purchase will inure to the benefit of his co-tenant. There is no rule of law, however, forbidding one tenant in common to purchase the interest of his co-tenant at such sale; this not being the purchase of a hostile or adverse title." See, also, page 678.

In Bissell v. Foss, 114 U. S. 252, 262, 5 Sup. Ct. 851, 854, 29 L. Ed. 126, the court held that there was no relation of trust or confidence between mining partners, which is violated by the sale and assignment by one partner of his share in the property and business to a stranger, or to one of his associates without the knowledge of the other. The court, while fully recognizing the rule that one of the tenants in common, holding by a common title, cannot purchase an outstanding title or incumbrance upon the joint estate for his own benefit, said:

"It is true that one of two or more tenants in common, holding by a common title, cannot purchase an outstanding title or incumbrance upon the joint estate for his own benefit. Such a purchase inures to the benefit of all, because there is an obligation between them, resulting from their joint claim and community of interest, that one of them shall not affect the claim to the prejudice of the others. [Citing authorities.] But this rule cannot apply to Hunter and Foss. They purchased no outstanding title or incumbrance to the prejudice of the other tenant in common. They did what any tenant in common with entire good faith might do, namely, purchase the interest of some of their co-tenants without consulting the others. The title which they purchased of the Missourians was not antagonistic or hostile to the title of Bissell. Their purchase did not in any degree tend to injure or damage his interest. His share was just as valuable after as before the purchase, and his rights were the same. In such a purchase no trust or confidence is violated."

If Henshall had been the entire owner of the property, and had leased the same to the Ibex Mining Company, could it be maintained that it could not, during the existence of the lease, purchase direct from him the fee, and thereby defeat eviction by the landlord? If, under the terms of the Archer consolidation, Reed, in execution of the power, could sell direct to the Ibex Mining Company all the interest of Henshall, could Henshall thereafter be heard to say that the Ibex Mining Company could not assert title under that purchase against the subsequent assertion of the landlord's claim against it as tenant? If not, how can it be maintained under the Colorado statute, which subjected Henshall's interest to sale under execution, that the company which acquired the title under operation of law could not plead a divestiture and termination of such landlord's title? The title which the law of landlord and tenant forbids the tenant to acquire so long as he retains possession under his entry is an outstanding, hostile title, antagonistic to that of the landlord, so as to destroy it. Moreover, the lease with the option to purchase, made by Reed, was in strict conformity to the terms of the Archer consolidation agreement, to which Henshall assented. It was in force at the time of the execution sale. At that time neither Jeffery and Dale nor Mrs. Jeffery were tenants of either Reed or Henshall. By the sale and sheriff's deed Henshall's interest and title in the property ceased, and devolved upon Mrs. Jeffery.

Finally, the equitable claim put forth by the complainants is condemned by the doctrine of laches. By virtue of their own inherent power in affording relief, in recognizing and enforcing unpublished trusts affecting the title to real property, courts of equity may shorten the time allowed by statute in actions of ejectment, where the ends of justice require it. While, for the purposes of this case, it may be conceded that such a state of facts might be presented as to warrant the chancellor, in good conscience, to extend the time for relief beyond the statutory period, the complainants' conduct in this case does not appeal to the favor of the court. Their claim rests upon an unrecorded secret trust between them and Henshall, created in 1879, nearly 14 years prior to its assertion in court. It concerns and affects the title to a mining claim—a class of property which, because of its well-known constantly vacillating character may be practically worthless to-day, and under the energy and expenditure of money by an after-taker and claimant, in a brief period may develop the presence of vast wealth in ore. In respect of such a claim. equity demands that the claimant should be awake to his rights, prompt in their assertion, and eager in their pursuit, lest his slothfulness and indifference work a great wrong to innocent parties. Vigilantibus et non dormientibus jura subveniunt. The evidence shows that when the complainants executed the power of attorney to Cartwright they regarded their claim of little value. It was checkered over with conflicting locations, and exposed to the devouring greed of promoters of litigation. So little value did they attach to it that for the services of merely disposing of it Cartwright was to have one-half of what he could obtain. While they claim to have seen the agreement in 1879 between Henshall and Cartwright, they never took interest enough in it to either put it to record or to look after it to see what became of it. They practically abandoned it to whithersoever the winds of fortune might drift it. Its condition when it passed under the care and sustentation of the Archer Syndicate is described in the testimony of Mr. Cavender, the attorney who undertook for the syndicate to look after the adverse litigation and the patent. When inquired of as to what was the situation of the Independence in respect of matters of patent, he said:

"The Independence was entirely gone. There was no application for a patent. All but 1.22 acres were patented to the Little Johnny, the Uncle Sam, and the San José claims, and that 1.22 acres had been covered by many relocations before the Ibex Mining Company or Mr. Campion had any interest in it."

He said it was a very doubtful proposition that in such condition a patent could be issued. He further said:

"I examined the ground—that is, traveled over it in connection with the engineer of the company—and found the discovery workings were gone—patented or relocated—I forget which now; I think patented or relocated by some one else. All the ground that was not patented was covered by other locations or claims, so that there was virtually nothing to patent."

When inquired of as to whether he examined the proceedings in the land office, he answered:

"I think the San José took in all the workings, the discovery shaft, etc.—discovery tunnel I think it was. My recollection is that that was done by

the San José. The application for that claim was in '80 or '81—I forget the exact date—but some ten years before. The other portion of the ground, down the hill, was covered by several new conflicting locations. The discovery shaft had been taken in by a patent upon another claim. That would terminate the title, except that which had already been obtained by the San José, Uncle Sam, and Little Johnny."

He further testified that at the time the acts were done which resulted in this ground being absorbed by the other claims neither Campion nor the Ibex Mining Company had any connection with the matter. It was in that condition when the lease and bond were given. In such low estimate was this property held that at the public auction under the Jeffery and Dale judgment in 1889 it sold for only sufficient to satisfy a judgment for $245.45 and the costs of suit. In perfect indifference, the complainants lingered and remained about that mining region and points of easy access to it, with the public records of the county showing that whatever apparent title they had had been conveyed under their power of attorney to a third party, who, as the apparent absolute owner, was contracting debts and being prosecuted therefor unto judgment; dealing with the property as his own; conveying it to Reed; entering into a syndicate agreement, under which it was leased to strangers, who were working and developing it, and paying the rental to the trustee. And after the Ibex Mining Company was organized, taking over the lease and purchasing outright the title of Henshall, in pursuance of the option given under the lease contract, expending money in developing the property, proving it to be valuable, and its stock presumably passing into the hands of investors, these complainants went off to the state of Texas without proclaiming or asserting to said interested parties their secret claim until more than 14 years after its birth. So long had they thus suffered this undisclosed trust to slumber, unnurtured and unattended, that when they came to ask the court to give it life and operation they were unable to recognize its features or specify its qualities, and only after long study, suggestion, and resort to analogy of their claim with some other found of record could they present even a plausible claim for specific relief. No fitter case has ever been presented for the application of the wholesome rule that "where one of two innocent parties must lose, and one of them is in fault, the law throws the burden of the loss on him." Hearne v. Nickols, 1 Salk. 289; Magee v. Manhattan Life Ins. Co., 92 U. S. 98, 23 L. Ed. 699.

The conclusion reached on the principal case renders it unnecessary to discuss the matter of the accounting.

It results that the appeal in No. 1,713, Clinton Reed (impleaded with the Ibex Mining Company et al.), appellant, vs. N. A. Munn and R. G. Munn, appellees, is sustained, and the decree of the Circuit Court therein is reversed; that the appeal in No. 1,890, the Ibex Mining Company, appellant, vs. N. A. Munn and R. G. Munn, appellees, is sustained, and the decree of the Circuit Court therein is reversed; that the appeal in No. 2,319, the Ibex Mining Company, appellant, vs. N. A. Munn and R. G. Munn, appellees, is sustained, and the decree of the Circuit Court therein is reversed; and that the appeal in No. 2,320, N. A. Munn and R. G. Munn, appellants, vs. The Ibex Mining

Company, appellee, is not sustained, and the same is dismissed, at the cost of the appellants; and the causes No. 1,713, No. 1,890, and No. 2,319 are remanded, with directions to the Circuit Court to set aside and vacate the decrees therein, and to dismiss the bill of complaint, at the cost of the appellees.